Eeade, J.
 

 It was admitted that the paper propounded was executed with the formalities which the law requires.
 

 In the first clause of the paper, there is a gift to “Edward Wood, his heirs and assigns forever, subject to such dispositions and instructions as I shall make in a private letter directed to him, and which he will find with this will.”
 

 In the second clause, there is a gift to “C. W. ITollowell, his heirs and assigns forever, subject only to the instructions I may give in a private letter I shall write him, and will be found with this my last will.”
 

 In the third clause, there is a gift to “ H. J. Futrill, his heirs and assigns forever, subject only to the instructions and provisions I shall make in a private letter directed to him, and which will be found with this my last will and and testament.”
 

 These clauses dispose of the bulk of the testator’s estate, which was a very large one.
 

 
 *266
 
 The testator then signed his name to the paper, which is without date, and ail in his own handwriting. * ■
 

 The writing then begins again, as follows: “Thus, after cool, calm and mature reflection, I have made this my last will and testament in these times of revolution and anarchy, when I know not what a day may bring forth, and when I do not know whether I shall be worth a half, or any portion of the estate I now possess, when I die, for which reason I have, made no specific legacies or devises, but rely entirely on the integrity, fidelity and moral sense of my executors appointed by this will, to carry out my intentions and instructions contained in-the private letters directed to each of them separately, written with my own hand, and enclosed in the same envelope with this will.”
 

 The paper is then signed by the testator, attested by three witnesses, and dated 10th April, 1863. And it is subsequently affirmed and signed again by the testator, attested by two other witnesses, and dated 13th September, 1863.
 

 Three letters purporting to have been written by the testator to the aforesaid persons, Wood, Hollowell and Futrill, were propounded as parts of the will, but they were objected to by the caveators as not being executed with the formalities required for a will, and his Honor instructed the jury that, taking all the testimony to be true, they could not be set up as parts of the will. The caveators then asked his Honor to instruct the jury, “ That, by reason of the rejection of these letters as parts of the alleged will, a trust resulted to the heir at law in all the property mentioned in the first paragraphs of the several devises and bequests to Wood, Futrill and Hollowell, which were made subject to the dispositions and instructions of said letters. That this was so by the law of England. But that the County Courts of this State, being courts of probate of wills both of real and personal estates, and the paragraphs aforesaid in the attested instrument being subject to and dependent upon
 
 *267
 
 the private letters which could not be recognized as parts of the will. It was unfinished and void as to those paragraphs.” The Court declined to give the instruction, and the caveators excepted. This exception involves the consideration of the powers and duties of our County. Courts as courts of probate, for the case is to be considered here as it ought to have been considered in the County Court.
 

 In the full and very able discussion with which we were favored by the counsel on both sides, the exception was considered as if the reference in the will were to private letters, which were
 
 not in existence
 
 at the time the will was executed, but
 
 thereafter to he xoritien.
 
 The language of the will is not very clear, and there may have been facts outside, which led to this conclusion. The language would seem to indicate that the letters were written at the time the will was executed. It is true that, in the body of the will, the reference is to letters which “ I shall write,” but, in the concluding clause above quoted the reference is to letters “written with my own hand, and enclosed in the same envelope with this will;” so that it seems probable, judging only from the language itself, that the testator wrote his will and signed it, and then wrote the letters, and then wrote the concluding clause and signed it again, and called in witnesses and had it attested. The letters were certainly written when the will was reaffirmed, September 13th, 1863. But however this may be, it could only be important on the trial upon the question whether the letters were part of the will; and that question was decided against the propounders, and they did not appeal. In passing upon the question, whether the will itself was to be admitted to probate, it makes no difference whether the letters could be admitted to probate or not; or whether they were written when the will was executed, or were thereafter to be written; or whether the letters propounded were the letters referred to; or whether any letters were ever written either
 
 *268
 
 before or after tbe execution of the will. These questions may be important hereafter when the construction of the will comes under consideration, but they are of no consequence in the probate court, upon the trial of the issue of
 
 devisavit vel non.
 
 And this brings us to the consideration of the powers and duties of our courts of probate.
 

 “The Courts of Pleas and Quarter Sessions shall, within their respective counties, take the probate of wills, and order them to be recorded in proper books kept for that purposeRev. Code, c. 119, s. 13. And if the validity of any last will and testament, whether written or nuncupative, shall be contested, the same shall be always tried by a jury, under an issue made up under the direction of the court; ib., 15. The uniform practice, when a paper writing is offered for probate as a will, has been, to prove the execution of the paper and obtain an order that it be recorded, without consideration of its contents, except so far as to see that it
 
 purports
 
 to be a will. And where the validity of the will is questioned, and it is submitted to a jury, the jury is restricted to the same inquiries. Where there is no objection, the court passes upon the validity of the paper, and where there is objection, the jury passes upon it; and, in either case, the proceeding is
 
 in rem.
 
 The probate passes upon the rights of no one under the will, but only establishes it as a will, leaving the rights of parties to be ascertained thereafter. We are not aware of any inconvenience or injustice that has resulted from this practice, and we believe that this is the first instance in which a departure has been insisted upon. Indeed, it was admitted at the bar to be a case of the first impression. The practice is in accordance with what we may suppose the theory to have been, and with the constitution of our probate courts. The justices who hold the courts are unprofessional men taken from the body of the people, and, therefore, incompetent to the task of construing wills; yet they are quite competent to
 
 *269
 
 pass upon the facts as to the execution of the paper, and in the same way jurors are compentent to pass upon such facts, when they are submitted to
 
 them.
 
 But our County Courts have not the learning which is necessary to construe wills and declare rights, nor have they the power or the means to declare and enforce trusts. We have tribunals with sufficient learning and adequate powers to these ends. But now it is insisted that when a paper is propounded for probate in our County Courts, the court or the jury, as the case may be,’ shall look not only to the paper to see whether it has the formalities which the law requires, and is in all respects complete as an instrument, but also into the
 
 contents
 
 of the instrument, to see whether the testator has used such language as in their opinion will effect what they may suppose to be his intention; and if the language is inartificial, so that there is doubt as to who will take the property, the instrument itself shall be declared to be “unfinished.”
 

 The inconvenience and confusion to result from such a practice are palpable. If the construction of the instrument is to precede its probate, then it would often be, that after the contents are explained and its meaning ascertained, the instrument itself would be declared void for the want of some formality in the execution, or of capacity in the testator. And, in almost every case, tire qualification of the executor, and the ordinary administration of- the assets, would be postponed until all the persons interested, or claiming to be interested in the legacies, shall have their rights declared; and after that, it may turn out that the whole estate is exhausted in the payment of the debts, so that nothing is left for the satisfaction of the legacies. In this case? the court was asked to determine the question between the legatees and devisees on the one side and the heirs at law on the other, when it may turn out that there are debts enough to exhaust the whole estate, so that neither the devisees nor the heirs have any interest. Whereas, under the usual prac
 
 *270
 
 tice, the will would be admitted to probate, the executor qualify and administer the assets, and in proper time, and in the proper court, the devisees and the heirs at law have their rights settled. The caveators insist that the gifts to Wood, Hollo well and Futrill, were upon trusts to be declared, and that no trusts were ever declared, and, therefore, there is a resulting trust to the caveators as the heirs at law. Supposing that to be so, they add that the will is “unfinished,” and cannot be admitted to probate. But the doctrine of unfinished, or incomplete instruments, applies not to the construction of the contents, but to the execution of the instrument. It may be shown that a testator intended that his estate should be divided
 
 per stirpes,
 
 but by reason of inartificial ^language, it will be divided
 
 per capita;
 
 but such a will would not be called “unfinished.” So, in his will duly executed, he may declare his purpose to execute a codicil, which he fails to execute; still his will is “finished,” and must be admitted to probate. So the doctrine of con-. ditions precedent and subsequent apply not to the validity of the will, but to the vesting or not vesting of the legacy. Many cases were cited by the counsel for the caveators to show that papers referred to, which were not
 
 in existence
 
 at the time, but thereafter to be prepared, and also papers which were insufficiently described, could not be set up as parts of a will; but no case was cited to show that the wills themselves were refused probate because the papers referred to were rejected. Indeed, in the cases cited, the wills were established. If a paper, purporting to be the will of a
 
 feme
 
 covert, were offered for probate, the probate court would reject it, because a
 
 feme covert
 
 has not the power to make a will; but if marriage articles were produced which purported to allow the
 
 feme covert
 
 to make a will, then the will would be admitted to probate without looking into the articles for the purpose of construing them, any further than to see that they give
 
 color
 
 to the act of the wife. In the case
 
 *271
 
 of
 
 Whitfield
 
 v.
 
 Hurst,
 
 9 Ire., 170, Ruffin, C. J. says: “In the first place, the court holds that the marriage contract is to be deemed in this proceeding an authority to the wife to make a will. We do not mean that we now put a final construction on that instrument, and determine that it vested a separate estate in the wife, either absolute or temporary; for those are points not proper for the construction of the court in a probate cause. It is true that this court exercises as an appellant tribunal the functions both of a court of probate and a court of equity; and, therefore, it might be supposed that it would be well to decide all the questions that could arise under that instrument at once. But in the form in which the case is now before us, the court can only deal with such matters as were cognizable before the County Court in this very case, because we are not proceeding originally, but reviewing the decision of that and of the Superior Court. Therefore, we put no construction on the paper further than to say that it at least gives a color to the act of the wife, for that is sufficient to induce the court of probate to admit the paper, leaving it to a court of equity ultimately to construe and enforce the articles, and compel the execution of the will, if made in view of that court under a sufficient authority, or by virtue of a sufficient estate in the wife.” So, in the case of
 
 Redmond
 
 v.
 
 Collins,
 
 4 Dev. 430, the question was discussed whether under the will which was offered for probate, the executors took the legal estate, or whether a
 
 power
 
 only was given them, 'whilst the land descended to the heir. The court says: “The question before such a court (court of probate) is, whether the paper is duly executed to pass the legal estate ? It has no concern with the trusts upon which it is given, or to the construction of the will, which must be enforced in this, as in other respects, in another court.” '
 

 The exception which we are considering in this case clearly shows the confusion which would result from the practice which it seeks to establish. Four papers are offered for pro
 
 *272
 
 bate. It is not for the court, but for the jury, under proper instructions, to say whether any or all of these papers be a will. The court instructed the jury that, all the evidence being true, three of the papers had-not the formalities which the law required, and therefore they could not be set up,, and that they must find against these three papers. Now, if the propounders had objected to this charge, and had appealed, it would have been necessary to set forth the evidence, to see whether the instruction was right. But the propounders did not except, and, therefore, there is nothing to be considered upon that part of the case. But how about the fourth paper ? What is to become oi that ? The three papers were not executed according to the formalities which the law requires; they were not attested, nor were they found with the valuable papers or effects of the testator, nor deposited with a friend for safe keeping. It was proper therefore for the Judge to tell the jury that, taking all the evidence to be true, they must find that they were no part of the will. But the fourth paper had all the required formalities ; it was properly written, signed and attested, and therefore his Honor could not charge the jury that, taking a.11 the evidence to be true, it could not be set up as a will, but would have to charge them precisely the contrary; and, therefore, he was asked to take the question of fact from the jury, and to declare as a matter of construction that, because they had found against the other papers, this paper was
 
 unfinished and void.
 
 Upon the trial of the issue of
 
 devisavit vel
 
 non, it was for the jury to say whether the paper was or was not finished, under proper instructions as to what constituted a finished paper. And just as he had charged the jury that if they believed the evidence they must find against the three papers, so he. must charge them that, if they believed the evidence, they must find for the fourth paper. Y et he was asked to declare as a matter of construction of the contents, without regard to the formalities of
 
 *273
 
 execution, that there was a resulting trust to the heirs,
 
 and,
 
 therefore,
 
 what
 
 ? — not that the will must be set up, and the trusts declared and enforced by a court of equity according to the course and practice of the court, but that the will itself was unfinished and void. He was obliged to tell the jury that the letters were no parts of the will, whatever might be their contents, because they had not the formality of execution which the law requires. If, then, the formalities of execution without regard to the contents were decisive of three of the papers offered, why was not the formality of execution, without regard to the contents, decisive of the fourth paper ? If the Judge could not look into the contents of the three papers, and
 
 set them wp,
 
 because they
 
 did
 
 contain the will of the testator, how could he look into the contents of the fourth paper, and reject it because it did
 
 not
 
 contain his will.
 

 It will be noticed that we do not consider the question whether there is a resulting trust to the heirs or not. It may be that the devisees will take the property, discharged of all trusts; or, it may be that the trusts declared in those letters may be enforced; or, it may be that there are other letters yet to be produced. •
 

 Our conclusion is, that when a paper writing, purporting to be a will and offered for probate, is executed with the formalities which the law requires, by a person who is competent to make a will, it must be admitted to probate, without regard to the construction of its contents, or the consideration of any trusts which may be declared or which may result to the heir.
 

 2. It was not agreed at the bar, and we are unable to determine’ from the exception, which party introduced in evidence the declaration of the testator that' one of the caveators was a gambler. Nor does it appear at what time of the trial it was introduced. If it was introduced by the propounders in their beginning, then the proper time for the
 
 *274
 
 caveators to meet it was in their answer. But if the propounders introduced it in their reply, then the caveators could have met it in their rejoinder. In justice to the learned Judge who tried the cause, it ought to be presumed that, if the propounders introduced the evidence, it was in their beginning and not in their reply, because the Judge puts his refusal to allow the caveators to offer evidence to disprove the truth of the declaration, upon the ground that it was not offered in apt time. It would have been in apt time, if offered at the first opportunity, and, therefore, we are to taire it that it was not offered at the first opportunity, for the charge of the Judge is presumed to be right, unless it is shown to be wrong. If therefore there was error, it is the misfortune of the caveators, because it was incumbent on them to sustain their exception, by showing that there was error. It is true that the presiding Judge may allow evidence to be introduced at any time before the verdict is rendered, but this is at his discretion. The course and practice of the court as to the order in which the testimony is to be introduced is well settled and well understood by the profession. It is very important that it should be observed. It ought not to be departed from, except in cases of surprise or mistake in matters seriously affecting the merits of the cause, and of that the presiding Judge has a discretion which we cannot review. It is not .to be presumed in any case that the discretion will be abused. We have great satisfaction in believing that the parties to this cause were indulged upon the trial below in every reasonable relaxation. And it is to be mentioned in high commendation of the learned Judge and the eminent counsel who tried the cause,, that although the trial occupied a month, and many embarrassing questions arose, not an error is discovered in any part of the proceedings, and if by inadvertence the evidence was lost in the particular now under consideration, it is a relief to know that it could scarcely have been material;
 
 *275
 
 for, whether the person alluded to was a gambler or not, the testator thought he was, and his belief of that fact would as certainly have excluded him from his bounty as if the fact existed. The only light in which it could have been important to contradict it, was to show that the testator must have been under an insane delusion, to believe a man to be a gambler who was not so in fact. But it is such slight evidence of insanity to make such a mistake, that, unless the case had been precisely balanced, it could not have turned it.
 

 3. In order to show the insanity of the testator, the caveators proved that, on some occasion, he acted in what seemed to be a strange manner. As an explanation, the propounders were allowed to offer evidence to show that the alleged conduct was not an indication of insanity, but was only a peculiarity, and was habitual with the testator when he was admitted to be sane. And the caveators excepted. There is no force in the exception. All men are not alike. Their minds, manners, temper and habits are as various as their faces. And in investigating the state of the mind as indicated by any particular conduct, it is legitimate to compare that with his general conduct when he is admitted to be sane. We know that the contraction of the brows, a frown, is indication of displeasure, but if what seems to be a frown is a natural formation, or a habit, or a peculiarity, it would be proper to show it, in order to rebut a false but natural inference. So, if excessive mirth, as is common with some, or excessive sadness, as is common with others, were relied on to show insanity, of which it is sometimes an accompaniment, it would be competent to show that these appearances were habitual and natural. But suppose this were not true, what right have the caveators to complain of the evidence? For, if a single act of the kind relied on by them was evidence of insanity, then continued acts of the same kind, proved by the propounders, were multiplied evidences of the same thing, and, therefore, aided the caveators in making out their case.
 

 
 *276
 
 4. Some two years after the testator had made his will, he made a statement to G. J. Cherry, explaining why he had made his will; and he caused Mr. Cherry to write down the statement. After the statement was written, Mr. Cherry read it over to the testator, and he approved it, and requested Mr. Cherry to sign it, which he did. Some time thereafter the testator caused J. E. Norfleet to read over to him the same statement, and he acknowledged and approved it, and Mr. Norfleet signed it. This paper was offered in evidence by the propounders to show capacity. And the caveators excepted. The exception is taken upon the ground that the only use which could be made of the paper was to refresh the memory of the witness, who might speak of the statement. But this paper is not what the witness wrote down of his own mind to refresh his memory, but it was the dictation of the testátor, and though written down by another, was adopted and approved by him, and is the same as if he had written it himself. The names of Cherry and Norfleet which they put upon it, were only marks by which they could identify it. The contents of the paper, dictated by the testator, were unquestionable evidence of his capacity, and the paper was properly admitted.
 

 5. It is well settled that the opinion of an expert is com. petent evidence in questions touching the science or art which he professes. And when an expert has given his opinion, it is also competent for him to give the reasons upon which his opinion is founded, in order that it may be seen whether his opinion is entitled to more or less weight. And, in this way, and in this way only, can it be determined whose opinion is entitled to most consideration, where experts differ. Here the caveators took the opinion of an expert as to the sanity of a testator, and then attempted to elicit facts to support the opinion. And if the facts sought to be elicited were relevant, then it was error to exclude them. What then were the facts sought to be elicited?
 
 *277
 
 Not anything that he had learned in relation to the testator, or anything which he knew or had learned from science or from scientific men, but facts which he had heard an insane man relate as to the history of his disease, and facts which he had heard an unprofessional nurse relate of the history of the patient, facts to which he had applied no test of truth, and to which none could be applied. Surely the exclusion of such testimony from the consideration of the jury was most proper, and so far from injuring, must have benefitted the caveators; for if the expert had sustained his opinion upon such considerations as these, his conclusion would have been as worthless as his reasons were frivolous. They could not possibly have added any weight to the most hesitating, and they would certainly have detracted from the most confident, opinion. Courts charged with the investigation of truth are greatly indebted to men of science who contribute the aid of their opinions. But marvellous narrations and careless stories disparage science, mislead rather than instruct, and ought not to be allowed consideration.
 

 6. The catalogue of the testator’s family and connexions, contained in a book which he aided in having published, and which he said was a correct “account of his family,” was competent evidence for the purpose for which' it was introduced.
 

 7. Sanity is the natural and usual condition of the mind, and, therefore, every man is presumed to be sane. But this presumption may be rebutted, i. e., the contrary may be proved, in any given case. What amount of evidence is sufficient to rebut it is a question not of law for the court, but of fact for the jury. When the presumption is rebutted and insanity is established, then there is a presumption that insanity continues. But the presumption may be rebutted, i. e., the contrary may be proved to be the fact. What amount of evidence is sufficient to rebut it is also a question not of law but of fact. If it was established in this
 
 *278
 
 case that the testator was insane at any time, then insanity is presumed to have continued. But the presumption might be rebutted. And what amount of evidence was sufficient to rebut it was a question not of law but of fact. If therefore the transaction of ordinary business was
 
 any
 
 evidence to rebut the presumption of the continuance of insanity, the Judge could not have instructed the jury as he was asked to do, that it was not sufficient evidence; for the
 
 sufficiency
 
 of evidence is never a question of law, but is a question for the jury. The fact of asking the Judge to charge the jury that it was not sufficient, seems to imply that it was some evidence. We think that the transaction of ordinary business by the testator was
 
 some
 
 evidence of his sanity, and, therefore, it was some evidence to rebut the presumption of the continuance of insanity. And the weight of the evidence was properly left to the jury. Observe that this would be so even if a case of general insanity were under consideration. But this was a case of alleged partial insanity, of recent occurrence, and probably of temporary character, and, therefore, the presumption of its continuance was not a strong presumption, and a jury might be satisfied with much less evidence to rebut it than if it had been of a general or more permanent character. Insanity from drunkenness, fever, grief, or other exciting cause, usually abates, and, therefore, may be presumed to abate, as the exciting cause is removed. And whether the exciting cause has been removed, and whether the mind is restored, and what is sufficient evidence in any given case, depends upon its peculiar circumstances, and cannot be a question of law. It was very properly left with the jury in this case.
 

 The estate involved in this controversy was one of the largest in the State. The counsel on both sides were eminent and zealous, and the learned Judge was patient and discriminating. The questions were numerous, and some of them were intricate. The exceptions, of which there were
 
 *279
 
 many, were all abandoned in this court except those which we have considered. We believe that the rights of the parties, so far as they could be considered in this proceeding, have been fairly passed upon.
 

 This opinion will be certified to the court below, to the end that a
 
 procedendo
 
 may issue to the County Court to admit the will to probate.
 

 Per Curiam. There is no error.