## STATE v. J. H. HEAVENER.

(Filed 9 December, 1914.)

1. Appeal and Error—Objections and Exceptions—Brief—Answered Questions—Harmless Error.

Exceptions in the record not set out in the appellant's brief are taken as abandoned under Supreme Court Rule 34 (164 N. C., 551), nor will such exceptions be sustained when it appears that they were made to questions which were in fact answered.

2. Homicide—Self-defense—Prisoner's Apprehensions—Comparative Physique —Trials—Evidence—Questions for Jury.

Upon a trial for homicide, where it appears that the prisoner and the deceased entered willingly into the fight, and that the prisoner shot and killed the deceased when the latter was following him apparently unarmed and striking him with his hand, it is competent for a witness in behalf of the State, a physician who had professionally attended the deceased, to testify that the deceased had had tuberculosis for several months before his death, accompanied by a cough and loss of voice, the prisoner having pleaded self-defense and testified that the deceased was taller than he was, and weighed more, it being for the jury to determine

whether the deceased, in his physical condition, was apparently weak or strong or incapable of overpowering the prisoner or of successfully resisting his attack.

3. **Appeal and Error—Homicide—New Trials—Prejudicial Error—Immaterial Evidence.**

Upon a trial for homicide, when it appears that the prisoner and deceased became suddenly engaged in a fight, in the former's store, and that the prisoner shot and killed the deceased with a pistol which he drew from his pocket, testimony of a witness that the prisoner kept his pistol in a showcase near which the firing commenced will not be held as reversible error, as it cannot be considered that testimony of this slight character could have influenced the jury in deciding the main issue as to the guilt of the prisoner, or that a different result would follow upon another trial. *Semble*, the evidence admitted was competent under the circumstances of this case, and, furthermore, being objected to after it had been received and there being no ruling thereon by the trial court, its admission cannot be held as error on appeal.

4. **Homicide — Verdict, Directing — Nonsuit — Deadly Weapon—Malice, Presumption.**

Malice is presumed from the killing of a human being with a deadly weapon, with the burden on the defendant to show facts and circumstances which would reduce the homicide from murder to manslaughter or excusable homicide, and under such circumstances the judge may not direct a verdict for the defendant, especially, as in this case, where there is evidence that the prisoner has used excessive force in repelling the attack made on him by the deceased, which raises a question for the jury.

5. **Homicide — Trials—Instructions—Verdicts—Appeal and Error—Harmless Error.**

On a trial for homicide, where the verdict rendered by the jury convicts the defendant in a less degree, the refusal of the court to give special instructions upon the law, arising from the evidence, of murder in the second degree is harmless if erroneous.

6. **Homicide—Trials—Instructions Given—Instructions Asked—Appeal and Error—Harmless Error.**

Where self-defense is relied on upon a trial for murder, the refusal of the defendant's prayers for instruction as to his reasonable belief that he was in danger, when sufficiently covered in the charge to the jury, is not erroneous.

APPEAL by defendant from *Webb, J.,* at February Term, 1914, of CATAWBA.

The defendant was indicted for the murder of one Summey Huffman. It appears that, on or about 1 November, 1913, the deceased went to the store of the accused. At the time of the homicide there was no one in the store but the prisoner, his wife, the deceased, and one A. W. Rhinehardt. Heavener and Huffman became involved in a quarrel, and Heavener shot Huffman three times, twice in the chest, once on the left side, and once on the right side, and the third shot struck the upper and

back part of the head—about the crown of the hair. A doctor testified: "Either of the shots in the chest might have killed him; both in the chest, in all probability, would; I am sure the last would alone—the shot in the head."

In order to understand the nature of the questions presented by the exceptions, it will be sufficient to set out only a part of the testimony of A. W. Rhinehardt, a witness for the State, who stated: "I live in Lincolnton and know where J. R. Heavener lives and where his store is. It is in Catawba County, near Mr. Lewis Rudisill's store. I knew Summey Huffman. He is dead now. He died the first day of November, 1913, I believe. He died in Mr. J. R. Heavener's store building between 1 and 2 o'clock, to the best of my knowledge. He was shot three times—in the right and left sides, and in the top of the head. I don't know where he was injured in the right side—somewhere in the right lung, and on the left side; he was injured near the heart, about the lower part of the back of his coat, about here (indicating); and he was shot in the top of the head, just in front of the crown of the head, as well as I could say, up in the hair. I cannot tell whether that ball went through the head. I don't know that the balls came out any part of the body. I saw the hole blown through the top of his head and his hair burnt. I never paid any attention to anything oozing from the place, because I just barely looked at it. I got to the store between 1 and 2 o'clock; had no timepiece with me. The defendant and Summey Huffman were both there when I got there. They were brothers-in-law; Huffman married Heavener's sister. Mrs. Heavener was the only other person in the store when I got there. Mr. Cling Sigmon was going out when I went in; met me at the door coming out. I went in the store, and the first I saw about this whole thing was that Mrs. Heavener was back about the heating stove at the left-hand counter as you go in the store from the front, and Mr. Huffman was there cursing her. I couldn't tell the language he was using. Mr. Heavener was standing behind the right-hand counter, or near the right-hand counter, across about even with her, and Mr. Heavener said: 'Hush up and come on up here, and we will make out that statement.' They came on up to the front, and Mr. Huffman sat down on a chair at the front door and asked him to make him an itemized statement of what he and his family owed him, and he would pay him, and Mr. Huffman told him to make it $6 and not more, for that was all it was, and there was some vulgar talk used by Mr. Huffman to Mrs. Heavener. When he made those remarks, Mr. Heavener says, 'Hush up, that is too bad; better mind what you are saying.' By that time Mr. Huffman rose up off the chair and walked to where Mr. Heavener was, at his little glass showcase he had his books lying on—writing desk, or whatever you call it—put his right hand on the corner of this book-desk

and says to him, 'If you don't make out that statement as I told you to—$6 even—I will beat you every time I catch you in my way.' He didn't have it that way, but I won't use the vulgar language. Mr. Heavener said, 'Well, it is $6.60,' 60 or 65 cents, and there was an oath right there, and Huffman slapped at him and called him a liar—slapped at him with his left hand; slapped him at first on the face; and at that time Heavener threw his hand on his hip pocket and threw up his left hand and said, 'Don't you come on me. I will take your life out of you,' and cursed him—said it somehow that way. Huffman said something at that time, and slapped at him again, and Heavener took the pistol and shot the first shot. When Heavener shot the first time, he and Huffman were facing each other; either one was in reaching distance of each other. I noticed the load splatter on the right side of his chest—the fire out of his pistol—and then Mr. Heavener stepped back and got around behind the counter. Huffman kept after him, and slapped at him as he went, both walking slowly, Heavener backwards and Huffman forwards, and I heard the pistol snap two or three times before he fired the second time. When he fired the second time he was hit in the left side of the chest, and he sank down—began to sink, just going down, and caught the counter with his left hand. As he sank down, it appeared he was wanting to hold himself up, and he got weaker and weaker, and kept sinking, and as he sank down with his head about level with the top edge of the counter, Heavener shot him in the top of the head. When Huffman was shot the last time, he was behind the counter. When Huffman began to sink, Heavener was standing right in front of the heating stove and looking at him as he went down. Just immediately before he fired the shot in the top of the head, he moved forward towards him—either leant or made a step. I couldn't tell you the exact height of that counter; it was just an ordinary counter—higher than that table (indicating). When it first began, Heavener was standing at the opening between the counters, and Huffman was out in the aisle. Huffman slapped at him with his left hand, and had nothing in his hand, and had nothing in his right hand that I saw. When the first shot was fired, Summey was standing with his hand on this little glass showcase that set off from the end of the counter, and Heavener was standing at the end of the counter; Huffman was in about reaching distance. When Huffman struck with his left hand, Heavener pulled out his pistol and fired. He reached back in his hip pocket, and when he came out with his hand there was a pistol in it. Just before he reached to the pocket from which he took the pistol, he said, 'I will take your life.' When that first shot was fired, Huffman was following Heavener. I couldn't tell you how many times the pistol snapped. I heard it. When Huffman slapped at Heavener, he didn't have anything in his hand, that I know

of. When the second shot was fired, Huffman began to sink this way (indicating), and he was low enough to reach up with his hands to the top of the counter to hold himself; put his left hand on top of the counter. At that time Heavener was about the same distance from him he had been in the time of backing; Heavener leaned over or stepped over, made a bow towards him. When he fired the ball in the top of the head, Huffman slipped right straight back, and Heavener said (making sound indicated by witness), 'Too bad; somebody bring some water here and outen the fire.' Mrs. Heavener said, 'Is somebody afire?' He said, 'His clothes are burning.' She came from the back end of the store with a bucket of water and a dipper in it, and I took out a dipper full and went behind the counter and stood between the dead man's legs and poured water where the second shot was fired and 'outened' the fire; the fire was burning the turned-back part of his coat, or near about. I don't think Mr. Huffman breathed after I got behind there. I stood there watching him a minute or two, and he never moved. The first conversation defendant and I had together after this about anything was that I told Mr. Heavener that I expected I would have to be a witness on this, and to save my life I couldn't swear to the number of shots that were fired, if any missed him. I said, 'Let's look at the pistol and see how many cartridges were shot out of it,' and he said, 'All right,' and he got the pistol and broke it down and pulled the shells out of it, and there were three empty ones and two loaded, and he put them back, and I went out of the store; and he called Lester Walsh to go and tell Mr. Perry Jarrett to come down there, and then we walked out, and Mr. Heavener told me to come down to the corner, to the platform of the warehouse, that he wanted to talk to me; and I went with him, and he said, 'I want you to do all you can for me in this case; you are my main witness.' I said, 'I will do all I can—everything I can, as far as the truth goes.' That was the last of it. I went home. I can't tell you where Mrs. Heavener was during the shooting. She was somewhere between the heating stove and the back end of the store. I noticed her, when the first shot was fired, walking back the other way from the heating stove. Don't know where she went to. I was paying attention to the man doing the shooting, and wanted to keep myself out of danger. Mr. Huffman was drunk when he came in there. He appeared to me, when I saw him coming down the road just before, to be pretty drunk, was staggering very much. The stove was about halfway back in the building from the front door to the back door, and the shooting took place near the front door; commenced there, and the wind-up of it was nearly back even with the stove. Before Heavener shot, he used some kind of little curse word—didn't speak it very loud. He said that, and 'I will take your life' followed right along."

There was evidence on the part of the prisoner tending to show that he shot Huffman in self-defense and under great provocation, as the latter, it seems, had greatly insulted his wife, using profane and vulgar language in doing so, and when told to desist he became very angry with the prisoner and pursued and struck him, at the same time taking something out of his pocket, which prisoner testified put him in fear of his life and caused him to shoot to defend himself against the infliction of great bodily harm upon him by the deceased. This evidence will be noticed in the opinion.

The prisoner was convicted of manslaughter, and from the sentence of the court to confinement in the State's Prison for eighteen months he appealed.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*A. A. Whitener, W. C. Feimster, and Self & Bagby for defendant.*

WALKER, J., after stating the case: We will consider the exceptions in the order of their statement by the appellant.

Exceptions 1 and 2 were taken to the rulings of the court excluding evidence offered by the prisoner. The questions, to which the State objected, were in fact answered, so that no harm was done. Besides, these assignments of error are not mentioned in the prisoner's brief, and are, therefore, to be considered as abandoned by him, under Rule 34 of this Court (164 N. C., 551), which provides: "Exceptions in the record not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned by him." *S. v. Smith,* 164 N. C., 476; *In re Will of Parker,* 165 N. C., 130.

The third exception was taken to the testimony of Dr. F. T. Ford, that the deceased had tuberculosis for several months before his death, accompanied by a cough and the loss of his voice. But this was competent to show that he was not a strong man and able to cope with the prisoner in their struggle when he was shot. The prisoner testified that "Huffman was a tall man, some taller than he was, and must have weighed something like 50 pounds more than he," and this matter, as to the comparative strength and physical ability of the two men, was gone into more fully in the course of the trial. It was, therefore, relevant to show, in rebuttal of the prisoner's testimony, which was intended to produce the impression that he was inferior in strength to his antagonist, that this was not the case, but that the deceased was in such a state of health as to be much weakened thereby, and to the extent of losing much of his original and natural power and vigor as a man, which his height and general build would seem to indicate. "It is competent to show the state

of deceased's health at the time of the killing." 21 Cyc., 911. In *S. v. Hough,* 138 N. C., 663, it was held that evidence of the size and strength of the deceased could be considered for the defendant, in passing upon the plea of self-defense. The converse must be true, that the State may also have the benefit of it upon a similar plea. It goes to the question, whether the prisoner was justified in his apprehension that he was about to be killed or to receive great bodily harm. Reviewing this general principle, it is thus stated in 21 Cyc. at p. 911;

"*Physical Condition of Parties; Admissibility in General—On Part of Defendant.*—Evidence as to the relative size, strength, and physical condition of the parties to a homicide is admissible in behalf of a defendant only when the proof establishes a *prima facie* case of self-defense, or a predicate has been laid therefor by proof that at the time of inflicting the mortal wound defendant had been attacked by the deceased, and in the absence of such proof it is incompetent.

"*On Behalf of State.*—It is also proper for the State to show the relative physical strength of the parties; and while the rule requires that the inquiry should be general and not leading, with a constant view to avoid the introduction of irrelevant matter, the State may prove the age of the person assaulted as tending to show the fact of disparity of strength, or that he was intoxicated at the time and unable to make or resist an attack. It is competent to show the state of deceased's health at the time of the killing, or to show the mental and physical condition of the deceased immediately after receiving the mortal wound."

It was for the jury to say whether, in his physical condition, he apparently was weak or strong, capable or incapable of overpowering the prisoner in their combat, or of successfully resisting his attack. *S. v. Thawley,* 4 Harr. (Del.), 562.

We will consider the fourth assignment, though, in connection with the fifth, which is based upon an exception to the testimony of E. Q. Dellinger, as to the place in the store where the deceased kept his pistol. The witness stated that he did not know where it was kept at the time of the homicide, but two years before he saw it in his showcase at the store. He was not permitted to say what he was doing with it at the time he saw it. We do not perceive how this evidence, if incompetent, which we do not concede, was harmful to the prisoner. Jurors are presumed to be intelligent, at least, and they are not likely to attach any weight or importance to a fact that has no probative force whatever with respect to the issue in the case. This kind of proof was held to be admissible in *Lillie v. State,* 100 S. W. Rep. (Neb.), 316; but we put our decision upon the ground that, if there was any error at all, it was not prejudicial, and too insignificant to induce a reversal of the judgment. It could not possibly have any influence upon the jury in deciding the main issue as

to the guilt of the prisoner. That he had a pistol and used it with fatal effect is not questioned. There was practically no evidence of preparation beforehand to commit the crime. It was the result of a sudden quarrel, in which both engaged willingly, it seems, and the general evidence is of such a character as to exclude the inference that this attenuated fact had any part in producing the verdict. What we said in *S. v. Smith,* 164 N. C., at p. 480, 481, is very applicable and cannot be too often repeated or too highly commended: "A defendant is entitled in law to hear the particular accusation against him; to have the prosecution restricted to that accusation, and consequently the proof, and not to be convicted of any other offense than the one specially charged in the indictment. This is his natural and constitutional right. But there must be prejudicial and not merely theoretical error. Verdicts and judgments should not be lightly set aside upon grounds which show the alleged error to be harmless or where the appellant could have sustained no injury from it. There should be at least something like a practical treatment of the motion to reverse, and it should not be granted except to subserve the real ends of substantial justice. Hilliard on New Trials (2 Ed.), secs. 1 to 7. The motion should be meritorious and not frivolous. The commentators on New Trials, Graham and Waterman (vol. 3, page 1235), thus state the prevailing rule: 'The foundation of the application for a new trial is the allegation of injustice, and the motion is for relief. Unless, therefore, some wrong has been suffered, there is nothing to be relieved against. The injury must be positive and tangible, not theoretical merely. For instance, the simple fact of defeat is, in one sense, injurious, for it wounds the feelings. But this alone is not sufficient ground for a new trial. It does not necessarily involve *loss* of any kind, and without loss or the probability of loss there can be no new trial. The complaining party asks for redress, for the restoration of rights which have first been infringed and then taken away. There must be, then, a probability of repairing the injury; otherwise the interference of the court would be but nugatory. There must be a reasonable prospect of placing the party who asks for a new trial in a better position than the one which he occupies by the verdict. If he obtain a new trial, he must incur additional expense, and if there is no corresponding benefit, he is still the sufferer. Besides, courts are instituted to enforce right and restrain and punish wrong. Their time is too valuable for them to interpose their remedial power idly and to no purpose. They will only interfere, therefore, where there is a prospect of ultimate benefit.' Tried by this rule, we do not think any reversible error was committed."

The evidence here may have been competent as tending to show that the defendant was not afraid of the deceased, knowing that his pistol was all the time easily accessible to him, within the reasoning of *S. v. Kin-*

*sauls,* 126 N. C., 1095. In addition to what has been said, it may be remarked that the objection to Henry Shepherd's testimony, as to the pistol, seems to have been made after all of the evidence was in, or had been heard, and there was no ruling upon it. *Tyson v. Tyson,* 100 N. C., 360; *Scroggs v. Stevenson, ibid.,* 354; *S. v. English,* 164 N. C., 497. The other part of his evidence, to which exception was taken, the court excluded, and expressly instructed the jury not to consider it.

The court properly overruled the motion to nonsuit, or what is equivalent to the same thing, to direct a verdict for the prisoner, which was the subject of the sixth exception. The second prayer for instructions was also properly refused, because it requested the court to charge that the prisoner was not guilty of murder in the second degree, and he was acquitted of that offense, so he got by the verdict what he wanted, without the instruction, and this rendered the supposed error harmless. *S. v. Worley,* 141 N. C., 764. But there was no error in refusing the instruction, as there was ample evidence to support a verdict of murder in the second degree, if not in the first degree; and, besides, the killing with a deadly weapon having been admitted, malice was presumed, and the burden was upon the defendant to show facts and circumstances which would reduce the homicide from murder in the second degree to manslaughter or excusable homicide. *S. v. Brittain,* 89 N. C., 481; *S. v. Simons,* 154 N. C., 197; *S. v. Rowe,* 155 N. C., 436; *S. v. Yates, ibid.,* 450.

There was strong evidence to the effect that if defendant shot in self-defense he used more force than was necessary to resist the attack and protect himself, the question of excessive force being for the jury. The evidence, therefore, supports the verdict for manslaughter. *S. v. Quick,* 150 N. C., 820.

The last three exceptions, directed against the refusal to give the third, fourth, and fifth prayers for instructions, as to defendant's reasonable belief that he was in danger, were substantially given in the charge, and the prisoner was there accorded the full benefit of the principle of self-defense, as stated in *S. v. Turpin,* 77 N. C., 477; *Com. v. Selfridge,* Har. and Thompson Cases on Self-defense, p. 1; *S. v. Nash,* 88 N. C., 618; *S. v. Barrett,* 132 N. C., 1005, and the many subsequent cases approving them. He told the jury that, "If a man believes one in pursuit of him has something (deadly) in his hand, *whether he has something in his hand or not,* if the man honestly believes and has reasonable grounds to believe—that is, reasonable ground to apprehend, and he does apprehend—that he is in danger, then and there, of suffering death or great bodily harm, and fires his pistol under those circumstances, he is not guilty." This was quite as strong and broad as the prisoner's own prayer, and certainly it comprehended fully as much.

There was very little evidence that the deceased was assaulting the prisoner with a deadly weapon, or that the latter had any reasonable ground to think so; but the jury gave him the benefit of the doubt, and a most favorable construction of the evidence, and he has not the slightest ground to complain of the verdict. His attack upon the deceased was cruel and merciless. After he had practically rendered him helpless, he continued to fire upon him. This was excessive force, and called for a verdict of manslaughter at least. There are strongly extenuating circumstances, not in law, but morally, upon the question of punishment— the gross and vulgar insult to the prisoner's wife and the aggressive conduct of the deceased. But for leniency he must appeal to another department of the Government.

A most careful review of the whole case has satisfied us that no error was committed on the trial.

No error.