IN RE WILL OF ELI A. CRAVEN.

(Filed 6 October, 1915.)

1. **Appeal and Error—Prejudicial Error—New Trial.**

Error committed by the trial judge must be prejudicial to be reversible and to entitle the appellant to a new trial, for if he is not hurt by the ruling to which exception was taken, there is no reasonable ground of complaint.

2. **Appeal and Error—Evidence Rejected—Harmless Error.**

Where there is a will with two codicils, admittedly valid as to the will and first codicil, but the second codicil is sought to be set aside on the ground of fraud, declarations of the testator made some six or eight months before the date of the second codicil and previous to that of the first one, that the husband of the beneficiary was endeavoring to get the property therein devised to him, if the declarations were competent as evidence in the caveator's behalf, is not reversible error, under the facts of this case, it appearing that there was strong evidence that the mind of the testator had subsequently undergone a complete change towards the devisee, and that the evidence rejected, being merely cumulative, would not have affected the verdict.

3. **Same—Admissions.**

Upon the trial to set aside a will for mental incapacity and undue influence, it appeared that the will had two codicils, the latter of which only was sought to be declared invalid, and that the date of making the will and first codicil the testator was of sound mind, and was free from undue influence. The caveators offered a letter in evidence written by the beneficiary under the second codicil, bearing upon the mental condition of the testator, nearly three years before the second codicil was made and before the making of the first codicil. *Held,* the law presumes sanity when shown to exist until it appears to the contrary, and the rejection of the letter as evidence was immaterial or, at least, not prejudicial, sufficient mental capacity of the testator thereafter being shown with reference to the first codicil.

36—169

*In re* CRAVEN.

**4. Evidence—Witnesses—Impeachment—Warning.**

   Where a witness testifies to matter it is proposed to impeach, by matter tending to show something collateral to the issue involved in the action, he should first be given proper warning before offering the impeaching testimony as to his bias, temper, or disposition towards the parties or the cause, by directing his attention to the impeaching evidence, so that he may have an opportunity to admit, deny or explain it.

**5. Wills—Mental Capacity—Trials—Instructions.**

   The rule as to the mental capacity requisite for a testator to make a valid disposition of his property by will is sufficiently given when the court charges the jury that they must find that the testator knew at the time the nature and effect of his act, and that he was making a will disposing of his property and to whom, and the relationship of the beneficiaries to himself. The early and the more modern rule discussed by WALKER, J.

**6. Trials—Instructions—Wills—Mental Capacity—Prayers for Instruction.**

   There is no special formula required for instructing the jury as to the mental capacity required for the valid execution of a deed or will, and a special instruction requested thereon, though correctly stating the law, will not confine the judge to the language therein used, for it is sufficient if the trial judge substantially gives it in his own words, he not being bound by the language of counsel.

**7. Wills—Mental Capacity—Undue Influence—Evidence.**

   Mental weakness of the testator from old age, at the time of his making a will, or after his mind has lost a portion of its former vigor and has become weakened by age, disease or otherwise, compatible with sufficient mental capacity to execute a valid will, provided he understands all that he is about, and choses rationally between one disposition of his property and another, and is able to retain the facts in his mind long enough to dictate or write out his wishes, and to execute the will with the essential formalities.

**8. Same—Parent and Child—Kindness—Persuasion.**

   Acts of kindness or consideration shown by a child to an aged or sick parent do not, of themselves, show such undue influence upon the latter as will affect the validity of his will disposing of his property in favor of this child; nor will mere persuasion have this effect, where the testator has not been prevented from exercising his free volition; for such acts, to have the effect stated, must amount to such domination by the stronger over the weaker mind as to amount to the substitution of the will of the former for that of the latter, resulting in an unfair advantage over others entitled to the testator's favor, and who would naturally receive it, but for the intervention of this designing and controlling influence.

APPEAL by caveator from *Connor, J.,* at the August Term, 1914, of CRAVEN.

Caveat to codicil No. 2 of the will of Eli A. Craven, dated 1 November, 1912, tried before *Connor, J.,* and a jury, at August Term, 1914, of Chatham Superior Court. Eli A. Craven was born in August, 1824, and died in December, 1912, leaving a last will and testament, dated December, 1910, a codicil thereto, dated 11 February, 1911, and a second codicil thereto, dated 1 November, 1912, which is the one to which the caveat was filed. There was no contest as to the will itself, or

the first codicil, it being admitted by the caveators that, at the time of their execution, the testator was of sound mind, having sufficient mental capacity to make the will and the first codicil, and that at the time of making them he was not under any undue influence; but it was charged that, at the time when the second codicil is alleged to have been executed by him, the testator did not have sufficient mental capacity to execute a deed, will or codicil, and, besides, that he was induced to annex it to his will and the first codicil by the undue and fraudulent influence of the beneficiary thereunder, Mrs. Flora Underwood, and her husband, W. J. Underwood, being then a very old man and greatly enfeebled in mind and body. That he was under the care of the Underwoods at that time, and by reason of his imbecility and their power and influence over him, which they fully and freely exercised, the second codicil was procured by them, whereby he materially changed the disposition of his property, in favor of Mrs. Flora Underwood, who was his daughter, and to the detriment, if not the entire disinherison of John W. Craven, his son, and his grandsons, one of them his namesake, who had an equal claim with his daughter, Mrs. Underwood, upon the testator's favor and bounty.

The court submitted the following issues to the jury, which were answered by them as indicated:

1. Is the paper-writing dated 6 December, 1910, and every part thereof, propounded, the last will and testament of Eli A. Craven? Answer: "Yes."

2. Is the paper-writing dated 11 February, 1911, and every part thereof, propounded, a codicil to the last will and testament of Eli A. Craven? Answer: "Yes."

3. Is the paper-writing dated 1 November, 1912, and every part thereof, propounded, a codicil to the last will and testament of Eli A. Craven? Answer: "Yes."

Judgment was entered thereon, declaring the will and codicil to be valid and ordering them to probate, and caveators·appealed.

*R. H. Hayes, F. W. Bynum, H. F. Seawell for caveator.*
*A. A. F. Seawell, R. G. Dixon and Siler & Milliken for propounder.*

WALKER, J., after stating the case: There was much testimony received upon the issues thus joined between the propounders and the caveators, as to the validity of the second codicil to Mr. Craven's will, but we do not deem it material that it should be stated here, except to say that there was strong evidence coming from the side of the caveators to sustain their allegations, both as to the mental incapacity of the testator and as to the fraud and undue influence of Mrs. Underwood

and her husband, and, upon this testimony, the jury might well have given their verdict to the caveators, but there was evidence offered by the propounders, and the Underwoods, to show the contrary, and in this conflict of the testimony the case was properly one for the jury to find the facts and declare what was the truth of the matter.

There are several questions of evidence in the case, but on a careful examination of the record we do not think that, if there was any error in the rulings of the court in respect to them, it constitutes sufficient ground for granting a new trial. It is not any and every error committed during the course of a trial that should induce an appellate court to set aside a verdict and judgment and award a new trial, as before this is done there should be both error and prejudice to the appellant. If he is not hurt by the ruling to which exception was taken, there is no reasonable ground of complaint. We thus referred to this principle in *S. v. Smith,* 164 N. C., 480, and more recently in *S. v. Heavener,* 168 N. C., 163, and *Ferebee v. Berry,* 168 N. C., 282: "The foundation of the application for a new trial is the allegation of injustice, and the motion is for relief. Unless, therefore, some wrong has been suffered, there is nothing to be relieved against. The injury must be positive and tangible, not theoretical merely. For instance, the simple fact of defeat is, in one sense, injurious, for it wounds the feelings and disappoints the defeated party. But this alone is not sufficient ground for a new trial. It does not necessarily involve loss of any kind, and without loss or the probability of loss there can be no new trial. The complaining party asks for redress, for the restoration of rights which have first been infringed and then taken away. There must be, then, a probability of repairing the injury; otherwise the interference of the Court would be but nugatory. There must be a reasonable prospect of placing the party, who asks for a new trial, in a better position than the one which he occupies by the verdict. If he obtain a new trial, he must incur additional expense, and if there is no corresponding benefit, he is still the sufferer. Besides, courts are instituted to enforce right and restrain and punish wrong. Their time is too valuable for them to interpose their remedial power idly and to no purpose. They will not interfere, therefore, where there is no prospect of ultimate benefit."

The alleged declaration of the testator, some six or eight months before the date of the second codicil, to the witness E. F. Craven, as to "the efforts of Will Underwood to get the farm," with an expression of a desire by him that the witness should defeat them, might well have been admitted by the court as some, though exceedingly slight, evidence of undue influence, but in view of the special facts and circumstances of this case, and of the evidence showing a decided change afterwards in

the mental attitude of the testator towards his daughter, we do not think that its exclusion was so prejudicial as to justify us in granting a new trial because of it, and had it been admitted, we are of the opinion that it would not have affected the verdict one way or another. There was much stronger testimony in the case, as to what the testator's wishes were at the time of the conversation with this witness, and the evidence rejected was cumulative only, and added little or no weight to that which was admitted and heard by the jury. Its influence upon the verdict, if any, would have been exceedingly remote and attenuated. We are, therefore, of the opinion that the ruling was not prejudicial, because the proposed testimony was so inconsiderable in its bearing upon the issue, and of such little moment, so far as it had any probative force at all, that unless the case had been evenly balanced, it could not have turned the scales to the other side.

It is not by any means clear how the testator expected W. J. Underwood would try to get the land, whether by foul means or fair, or whether before or after the testator's death, nor whether his wife was expected to participate in his conduct or benefit by it. There is good reason for the belief that he was not referring to any undue influence to be exercised upon him, but to some other kind of effort. He evidently felt that he was unable to take care of himself in regard to it, but wanted some one to look after it when he was gone. In any view of the matter, we do not regard the evidence as of sufficient importance to make its exclusion the proper basis for a new trial. The rejection of the other evidence worked no harm, if it was erroneous.

The letter of Mrs. Flora Underwood, the beneficiary under the second codicil, as to the state of her father's health and mind, was written and dated 22 December, 1909, long—nearly three years—before the second codicil was made, and it is admitted that, at the time of the execution of the will and first codicil, Mr. Craven was mentally sound and capable of making them, and, moreover, was not affected by any undue influence. *Waterman v. Whitney,* 11 N. Y., 157. When sanity or mental capacity is shown to exist, at any particular time, the law presumes that it continues until the fact is shown to be otherwise. If there is no evidence at all in regard to one's mental condition, there is a presumption of sanity or mental capacity. He who alleges the contrary must prove it. This very question arose in the noted will case of *Wood v. Sawyer,* 61 N. C., 277, where *Justice Reade* said: "Sanity is the natural and usual condition of the mind, and, therefore, every man is presumed to be sane. But this presumption may be rebutted, *i. e.,* the contrary may be proved, in any given case. What amount of evidence is sufficient to rebut it is a question, not of law for the court, but of fact for the jury. When the presumption is rebutted and insanity is estab-

lished, then there is a presumption that insanity continues. But the presumption may be rebutted, *i. e.,* the contrary may be proved to be the fact. What amount of evidence is sufficient to rebut it is also a question, not of law, but of fact. If it was established in this case that the testator was insane at any time, then insanity is presumed to have continued. But the presumption might be rebutted. And what amount of evidence was sufficient to rebut it was a question not of law, but of fact." It is admitted that even if Mr. Craven's mind was affected, or impaired, on 22 December, 1909, by his falling from the buggy, on account of being benumbed by the intense cold, it was, afterwards, fully restored, so that he had the full possession of his faculties when he executed his will and the first codicil, and, therefore, they were valid acts of his. This being so, we do not see how the letter of Mrs. Underwood, as to his mental condition at that time, becomes material, and it may be said, at the least, that it had no important or material bearing on the case and would not have changed the result.

The attack on the witness C. E. Kinnamon could not be made by showing his bias without first directing his attention to the impeaching evidence, and recalling the circumstances, so that he might have an opportunity to admit, deny or explain it. *S. v. Patterson,* 24 N. C., 346. Where the matter in question is entirely collateral to the issue, the answer of the witness, proposed to be contradicted or impeached, is conclusive and binding upon the party asking the question. Where the matter is involved in the issue, or materially connected with it, and not collateral, the witness may be contradicted without being questioned in regard to it, although even then it would be fair to him that it should be done; and where it is collateral, but shows bias, temper or disposition of the witness towards the parties or the cause, he should be given the proper warning. *Clark v. Clark,* 65 N. C., 655; *Jones v. Jones,* 80 N. C., 246; *S. v. Patterson, supra; S. v. Lewis,* 133 N. C., 653; *S. v. Crook, ibid.,* 672; *Kramer v. Light Co.,* 95 N. C., 277. The account book offered in evidence had no relevancy to the issues. If the caveators intended to show thereby the desire of the testator for an equal division of his property among his descendants, that fact sufficiently appeared from the will itself, as it was framed before the second codicil was executed.

Caveators requested the court to instruct the jury as follows: "A will or codicil made by a person who is unable to originate an idea, or in his own powers express a wish, and whose only mode of communication is by adopting or rejecting suggestions made by others, is invalid." As we understand the law, there is no special formula for charging the jury as to the mental capacity required for the valid execution of a deed or will. We are of the opinion, though, that the court gave the instruction

substantially, in its direct response to the prayer, and at any rate it stated and explained the law fully and correctly in subsequent parts of the charge.    The court virtually told the jury that, in order for the codicil to be valid, they must find, as a fact, that the testator had mental capacity sufficient to execute it, that is, that he knew at the time the nature and effect of his act; that he was making a will, by which he was disposing of his property, and to whom he was giving it and how, and that he comprehended the relationship of the parties to him.    This, though not very full, sufficiently complied with the rule so often stated by this Court.    *Horne v. Horne,* 31 N. C., 99; *Bost v. Bost,* 87 N. C., 477; *Paine v. Roberts,* 82 N. C., 451; *Barnhardt v. Smith,* 86 N. C., 473; *Moffit v. Witherspoon,* 32 N. C., 185; *Cornelius v. Cornelius,* 52 N. C., 593; *Cameron v. Power Co.,* 138 N. C., 365; *Sprinkle v. Wellborn,* 140 N. C., 181.    The jury manifestly understood what was meant.    It ·is not necessary that the testator should be able to dispose of his property with judgment and discretion—wisely or unwisely, for he may do with his own as he pleases; but it is enough if he understands the nature and effect of his act and knows what he is about.    *Bost v. Bost, supra; Cameron v. Power Co., supra.*    Besides, the request of the defendant that the court charge in the language taken from the case cited in the brief did not confine the judge to the words thus chosen by the counsel, but he could use his own language to express substantially the same idea, if it was in itself correct.    It may well be doubted if the prayer was warranted by the evidence.

It follows that one who is incapable at the moment of comprehending the nature and extent of his property, the disposition to be made of it by testament, and the persons who are or should be provided for, is not of a sound, disposing mind.    And if this mental condition be really shown to exist, the will must fail, even though he may have a glimmering knowledge that he is endeavoring to make a testamentary disposition of his property.    It is here to be observed that some of the earlier cases have laid down the rule of testamentary capacity with much more subservience to and consideration for the purported expression of one's last wishes.    They seem to have assumed that there must be a total want of understanding in order to render one intestable; that a court ought to refrain from measuring the capacity of a testator, if he have any at all; and that unless totally deprived of reason and *non compos mentis,* he is the lawful disposer of his own property, so that his will stands as a reason for his actions, harsh as may be its provisions.    This ascribes altogether too great sanctity to the testamentary act of an individual as opposed to the law's own will set forth by the statutes and founded in common sense; and it is well that the best considered of our latest cases recede from so extreme and false a standard.    Notwithstanding the

modern rule to be favored, we should still, however, bear in mind that incapacity is more than weak capacity; and, as already intimated, mere feebleness of mind does not suffice to invalidate a will, if the testator acted freely and had sufficient mind to comprehend intelligently the nature and effect of the act he was performing, the estate he was undertaking to dispose of, and the relations he held to the various persons who might naturally expect to become the objects of his bounty.

While it is true that it is not the duty of the court to strain after probate, nor in any case to grant it where grave doubts remain unremoved and great difficulties oppose themselves to so doing, neither is it the duty of the court to lean against probate, and impeach the will merely because it is made in old age or upon the sick bed, after the mind has lost a portion of its former vigor and has become weakened by age or disease. Weakness of memory, vacillation of purpose, credulity, vagueness of thought, may all consist with adequate testamentary capacity, under favorable circumstances. And a comprehensive grasp of all the requisites of testamentary knowledge in one review appears unnecessary, provided the enfeebled testator understands in detail all that he is about, and chooses rationally between one disposition and another. Schouler on Wills, 2 Ed., 68 to 72, and notes. In the important case of *Delafield v. Parish,* 25 N. Y., 9, the Court, after announcing the fairer rule of testamentary capacity above set forth, spoke of the testator's mind as acting without external pressure wherever it acted properly. "The testator must, said the Court, "have sufficient active memory to collect in his mind, without (insidious) prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in regard to them"; and we may add, long enough to have been able to dictate or write out his wishes, and to execute the will with all due formalities.

The charge as to undue influence was in all respects sufficient under our decisions. While undue influence does not necessarily involve moral turpitude or even a bad or improper motive, if a person with even the best of motives has acquired a dominant power or influence over the mind of the testator or grantor, so that he is thereby induced to execute a deed, will, or other instrument materially affecting his rights or his property which he would not have made but by subjection to this controlling influence, so that it is not the product of his own will, or desire, freely and fairly exercised, but expresses only the mind and will of the other party, who procured the result, such an instrument, so obtained by this undue influence of the party having the superior power, may not unfairly or improperly be termed a fraudulent one. The chief inquiry is, Was the free-agency of the party upon whom the influence of the

other was exerted destroyed, so that the will of the party for whose benefit or at whose instance the instrument was executed took the place of his will, which was suppressed? This undue influence is generally found to exist between persons occupying a confidential relation, which gives one a superior advantage over the other, but it may just as well exist where one of them occupies the simple position of the stronger over the weaker, however this dominance may have been acquired or the disparity in will-power has been brought about. *McRae v. Malloy,* 93 N. C., 154. The cases decided in this Court which support the foregoing views as to what is undue influence are many and harmonious. *Myatt v. Myatt,* 149 N. C., 137, and cases cited; *Horah v. Knox,* 87 N. C., 490; *Wessell v. Rathjohn,* 89 N. C., 382; *Wright v. Howe,* 52 N. C., 412; *In re Abee's Will,* 146 N. C., 273. In *Wright v. Howe, supra, Judge Manly* said, at page 413: "Undue influence is defined to be an influence by fraud or force, or by both, and, in its application to the making of a will, signifies that through one or both of these means the will of the decedent was perverted from its free action or thrust aside entirely, and the will of the influencing party substituted for it. This definition is substantially given when the jury are told, 'It is a fraudulent influence overruling or controlling the mind of a person operated on.'" But while undue influence, as thus defined, may avoid a will, whether it was exerted by the beneficiary or any other in her behalf, is a deduction to be made by the jury from all the evidence. The mere fact that Mrs. Underwood was the testator's daughter and that she and her husband lived with him during his last illness and for some time prior to his death, and that they were kind and attentive to him in his last days, so that he became more favorably disposed towards his daughter than formerly, will not constitute undue influence, or, standing alone, be sufficient to warrant a jury in finding that it existed. It is not unnatural for a father to be grateful to his child, when she has shown him every mark of true and unselfish devotion at a time when he most needed it. Even moral suasion and entreaty will not invalidate a deed or will from a father in favor of his child, if fairly, legitimately and properly used, nor will the relation of parent and child give rise to any presumption of fraud or undue influence.

It was said in *Taylor v. Taylor,* 41 N. C., at page 27, by *Judge Pearson,* that, "Fair argument and persuasion may be used to obtain the execution of a deed or will. There is no evidence in this case that any advantage was taken or any undue influence exercised. The plaintiff fails entirely to make out a ground to assail a will, much less a deed." And in *Gash v. Johnson,* 28 N. C., at p. 292, *Judge Daniel* said that "A will certainly is not void because it has been obtained *by persuasion.* To make it void, the persuasion must be undue and fraudulent." The

courts have uniformly held that influence gained by kindness and affection will not be regarded as "undue" if no imposition or fraud be practiced, even though it induce the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. *Re Gleespin's Will*, 26 N. J. Eq., 523. Nor will the mere relation of parent and child, though in a certain sense confidential, raise a presumption of undue influence. *Lee v. Lee*, 71 N. C., 139. Nor will the fact that the testator, on his death-bed, was surrounded by beneficiaries in his will. *Bundy v. McKnight*, 48 Ind., 502. Nor will the circumstance that the testator, an old and helpless man, made his will in favor of a son who had cared for him and attended to his business affairs, his other children having forsaken him. *Elliott's Will*, 2 J. J. Marsh, 340 (Redf. Am. Cases on Wills, 434).

It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow it. These views were strongly approved and commended by the Court in *Mackall v. Mackall*, 135 U. S., 167 (34 L. Ed., at p. 84), where the conclusion was reached that, in a legal sense, undue influence must destroy free agency.

"It is well settled," said *Justice Brewer*, "that in order to avoid a will on the ground of undue influence it must appear that the testator's free agency was destroyed and that his will was overborne by excessive importunity, imposition or fraud, so that the will does not, in fact, express his wishes as to the disposition of his property, but those of the persons exercising the influence." The Court then also used language closely applicable to the facts of our case: "That the relations between this father and his several children, during the score of years preceding his death, naturally inclined him towards the one and against the others is evident, and to have been expected. It would have been strange if such a result had not followed; but such partiality towards the one, and influence resulting therefrom, are not only natural, but just and reasonable, and come far short of presenting the undue influence which the law denounces. Right or wrong, it is to be expected that a parent will favor the child who stands by him, and give to him, rather than the others, his property. To defeat a conveyance under those circumstances, something more than the natural influence springing from such relationship must be shown; imposition, fraud, importunity, duress or something of that nature must appear; otherwise that disposition of property which accords with the natural inclinations of the human heart must be sustained." And more apt are the words of this Court in *Wessell v. Rathjohn*, 89 N. C., at p. 382, as the relation there was that of father and

daughter. *Justice Merrimon* said: "It is not strange or unnatural that a father, feeble in health, of weak mind, and easily influenced by a daughter having opportunity to exercise such influence, should give his daughter a house and lot and execute to her a deed for it. It is natural that the father should provide for his daughter; this is a proper and orderly thing to be done. It is what the paternal feelings of good men prompt them to do; it is what just men commend and the law tolerates. Why should the law cast suspicion upon such a transaction? When the transaction, the deed, is right in itself, such as the law tolerates and the common sense of men approves as just, reasonable and commendable, and there is the absence of the relations of suspicion founded on motives of policy, no adverse presumption arises; on the contrary, the law presumes such deed or transaction in all respects proper and just, until the contrary is made to appear. The burden is on him who alleges the contrary, to prove it. There is no natural presumption, nor is there any founded in motives of policy, that parent and child will take advantage of one another; the laws of human nature forbid this, and he who alleges the contrary must prove it."

The question of undue influence at last comes to this, that it is not whether the testator or grantor knew what he was doing, had done, or proposed to do, but how *the intention was produced;* whether the beneficiary took advantage of his superior or dominant position, and used it unjustly and unfairly to acquire the particular benefit or interest, without there being that care and providence placed around the weaker person, whose bounty is the desired object, as against those who occupy the better position—the result being that the will of the testator is perverted thereby, and is unable to perform its natural function, and the final act ceases to be voluntary. *Huguenin v. Baseley,* 14 Vesey, 273. It must be a controlling influence which is exercised for the purpose of gaining an unfair advantage over others entitled to the testator's favor, and who would naturally receive it but for the intervention of this designing influence, which is brought to bear upon one unable to resist it, because his volition is overcome.

We have examined the case with care and can find no error in the record.

No error.