# IN RE ESTATE OF GEORGE MUMM.[1]

April 19, 1929.

No. 27,110.

*Smith & Callahan* and *Leach & Swore,* for appellants.
*Constant Larson* and *Roger L. Dell,* for respondents.

[1]Reported in 225 N. W. 102.

Taylor, C.

George Mumm, a resident of Douglas county for some 50 years, died March 12, 1926, at the age of 76 years. His will, executed October 13, 1925, was contested by his heirs at law on the ground that he lacked sufficient mental capacity to make a will and that the execution of the will had been procured through the undue influence of William Hardekopf and Bertha Hardekopf, the beneficiaries therein. The probate court disallowed it. The proponents appealed to the district court. That court submitted two questions to a jury, (1) whether the testator had sufficient mental capacity to make a will and (2) whether its execution was procured by undue influence, which answered the first in the negative and the second in the affirmative. On motion of the proponents the court set aside the verdict and granted a new trial, saying that the evidence in support of the will did not seem to have been given proper consideration by the jury.

The second trial was before another judge without a jury. He found that the testator was of sound mind and free from undue influence, and directed that the will be admitted to probate. This judge having resigned shortly after filing his decision, a motion to amend the findings and a motion for a new trial were made before a third judge. Both motions were denied, and the contestants appealed.

George Mumm acquired a farm in Leaf Valley in Douglas county 50 years ago or more. Shortly thereafter he married, and he and his wife lived in a two-room log house on the farm until removed to a hospital as stated later. While he seems to have built a substantial barn and perhaps other buildings, the original log cabin remained their dwelling house. They had no children. For 30 or 40 years before her death Mrs. Mumm was insane, and at two different periods had been in the hospital for the insane. Apparently about 1904 Mr. Mumm took her from the hospital, and thereafter the two lived alone in the log cabin. All the evidence is to the effect that he was strongly attached to his wife and insisted on keeping her with him. About 1919 Mumm became crippled and thereafter rented

his farm, apparently reserving the buildings and garden. A neighbor named Freudenberg assisted him from time to time in preparing the garden, in caring for his stock, and in business matters.

In the early part of May, 1925, Mumm fell in the yard. Freudenberg, who was present, assisted him into the house and placed him on the pallet which he occupied as a bed. Freudenberg notified Claus Mumm, a brother who resided in Minneapolis, that George was ill. Claus with Doctor Schmidt, a nephew who also resided in Minneapolis, drove to the farm and endeavored to persuade George to go to a hospital, but he refused saying that Freudenberg would take care of him. They returned to Minneapolis and a few days later again drove to the farm. On this visit they found Mrs. Mumm also ill and tried to persuade George that both he and his wife should be taken to a hospital. George would not consent, and they returned home. Thereupon Freudenberg called in the chairman of the board of supervisors, and the two called Doctor Sather of Alexandria. The doctor found Mumm unable to leave his bed and Mrs. Mumm suffering from a severe attack of pneumonia. The doctor went back to Alexandria, arranged with Mrs. Hardekopf to receive the Mumms into her hospital, and then returned to the farm with Mrs. Hardekopf and others and removed both Mr. and Mrs. Mumm to the hospital. Mrs. Mumm died three days later.

Mrs. Hardekopf's parents had been neighbors of the Mumms for many years, and she had known them from early childhood. She became a nurse in the hospital for the insane at Fergus Falls and had charge of the ward in which Mrs. Mumm was cared for while there as a patient in 1903 or 1904. She married later and lived on a farm near her old home for about 12 years. From time to time during this period she visited the Mumms and occasionally prepared food and took it to them. About 1923 she removed to Alexandria and established and thereafter conducted the hospital to which the Mumms were taken in May, 1925.

On October 13, 1925, Mrs. Hardekopf called an attorney by telephone to come to the hospital to draw a will. He went to the hospital with his stenographer. Mrs. Hardekopf conducted him to

Mumm's room and introduced him to Mumm and then left. Only the attorney, his stenographer and Mumm were present during the preparation of the will, and all the information from which it was prepared was given by Mumm. He said he wanted to will all his property to Mr. and Mrs. Hardekopf. The attorney asked if he had any relatives. He said he had. The attorney asked if he did not want to leave some of his property to these relatives or some of them. He said he did not; that they had paid no attention to him, had not seen him for many years, did not seem to care for him, and he did not care enough for them; and that he wanted to give all his property to Mr. and Mrs. Hardekopf because they had been good to him, had taken good care of him, and were to take care of him as long as he lived. The will states:

"I have given my property to Mr. and Mrs. Hardekopf for the reason that they have taken good care of me, and with the understanding that they will take good care of me as long as I live."

It was witnessed by the stenographer and by Doctor Sather, the physician who attended Mumm from the time he entered the hospital in May until his death the following March. He died from influenza and pnuemonia, not from the ailment from which he was suffering when the will was drawn. The doctor says that he might have lived for several years so far as that ailment was concerned. At different times after the execution of the will the testator expressed himself as well pleased with the arrangement made and entirely satisfied with the will. For many years his relatives had seen or communicated with him very infrequently, and for several years prior to the time that his brother came in response to the call of Freudenberg they had not seen or communicated with him at all.

Some 50 witnesses testified and the record is voluminous. We shall make no attempt to rehearse or summarize the evidence. We have examined it and find that it amply sustains the findings of the learned trial court. We may note that the testimony of the attorney who drew the will, a lawyer of long experience, high standing and unquestioned integrity, and the testimony of the attending

physician is especially persuasive and is supplemented by the testimony of many others.

Contestants insist that the court erred in permitting Mrs. Hardekopf to testify concerning conversations with the deceased. A lay witness is not permitted to give his opinion as to the mental condition of another until he has stated the facts upon which his opinion is based. The testimony in question was offered for the purpose of laying a foundation for the witness to testify concerning the mental condition of the deceased. Contestants objected to it on the ground that it was incompetent under G. S. 1923 (2 Mason, 1927) § 9817, which reads in part:

"It shall not be competent for any party to an action, or any person interested in the event thereof, to give evidence therein of or concerning any conversation with, or admission of, a deceased or insane party or person relative to any matter at issue between the parties."

Statutes of the same general purport, though varying more or less in form, are in force in nearly all of the states. In 40 Cyc. 2266, it is said:

"The statutes excluding evidence in actions by or against representatives, or relating to transactions with a decedent, are usually held not applicable in proceedings for the probate or contest of a will."

In Ann. Cas. 1914A, 982, the annotator states:

"It is held in a majority of jurisdictions, in accord with the reported case, that statutes prohibiting witnesses from testifying to transactions with a decedent are not applicable to proceedings to probate or contest a will."

Both cite many decisions in support of the statement. Among the reasons assigned for so holding are that such statutes, being in derogation of the right to testify, are strictly construed; and that such proceedings are not actions within the usual meaning of that term, but are judicial investigations to determine whether a par-

ticular document is the will of the deceased. Some courts hold that such statutes apply in such proceedings and bar those interested in the result from giving testimony as to conversations with the deceased for any purpose. Some courts, although holding that such statutes apply in such proceedings, hold that testimony as to the mental capacity of the deceased is not within the inhibition, and that parties interested in the result may testify as to such mental capacity and may give conversations with the deceased for the purpose of laying a foundation for such testimony but for no other purpose. In re Anderson's Estate, 114 Wash. 591, 195 P. 994; Bissett v. Bailey, 176 N. C. 43, 96 S. E. 648; Plemmons v. Murphey, 176 N. C. 671, 97 S. E. 648; In re Golder's Estate, 37 S. D. 397, 158 N. W. 735; Cato v. Hunt, 112 Ga. 139, 37 S. E. 183; Lamb v. Lamb, 105 Ind. 456, 5 N. E. 171; Burkhart v. Gladish, 123 Ind. 337, 24 N. E. 118; Williams v. Williams, 90 Ky. 28, 13 S. W. 250; also annotation in 8 A. L. R. 1097. This latter rule has been adopted by this court. In In re Brown, 38 Minn. 112, 113, 35 N. W. 726, a new trial was granted because testimony as to statements of the testator had been excluded, the court saying:

"His verbal acts were, equally with his physical acts, competent for the purpose of proving the mental condition of the testator."

Contestants stress the fact that in this case the court said that a party could not give evidence of a *conversation* relative to a matter *at issue* between the parties, and that the questions excluded did not tend to draw out any *conversation* with the deceased relative to the will. The words italicized were italicized in the opinion. The opinion shows that the excluded testimony was offered as substantive evidence and not as a basis for the formation of his opinion by the witness. This may also be said of Cady v. Cady, 91 Minn. 137, 97 N. W. 580, and of Wheeler v. McKeon, 137 Minn. 92, 162 N. W. 1070, 1 A. L. R. 1514.

In the Wheeler case interested parties were permitted to testify to conversations with the deceased which indicated a defective mind; but the conversations given were not connected with the

execution of the contract in controversy. The court cited the Brown case, 38 Minn. 112, 35 N. W. 726, and held in effect that such conversations could be given in evidence as in the nature of verbal acts bearing on the question of mental competency.

In Chapel v. Chapel, 137 Minn. 420, 163 N. W. 771, the trial court refused to permit an interested party to give conversations with the testator for the purpose of laying a foundation to testify as to the mental capacity of the testator and refused to permit him to testify as to such mental capacity for the reason that he had not laid a foundation for such testimony. The court held that the rulings were erroneous and granted a new trial for that reason. That case passed upon the precise question here involved, and following it we hold that the testimony received was admissible for the purpose for which it was offered.

It may be proper to add that where issues are submitted to a jury, care should be taken to admit only such conversations or talks as are necessary to lay a proper foundation for the testimony of the witness, and that the jury should be cautioned that they are admitted solely for that purpose and are not evidence of the truth of the statements made. Here there was no jury, and the learned trial court, who fully understood the purpose of such testimony, would give no improper effect to it.

We reach the conclusion that the order appealed from should be, and therefore it is, affirmed.