The action was brought to set aside certain deeds made by Levi Plemmons to his children for the purpose of division among them, and it is alleged that they were obtained from him when he was not mentally capable of executing a deed, and also by unfair and undue influence exerted by those of the defendants, J. R. Murphy and his wife, Hattie *Page 673 
Murphy, who was the donor's daughter, and J. C. Plemmons, one of his sons. There is also an allegation that they had illegally converted his personal property, worth $4,000, and consisting of notes, bank certificates, cash, cattle, mules, farm products, and farm implements, and other of his assets.
The court submitted issues to the jury, and they found that the grantor, Levi Plemmons, had sufficient mental capacity to execute the deeds, but that they were obtained from him by the undue influence of the defendants.
The statement of the evidence is very voluminous, and it would be useless to set it forth even substantially, and we content ourselves with making only a brief recital of some of its prominent features, using in many instances the words employed by the witnesses:
"Levi Plemmons, to whom the witnesses refer as `a fair man,' `a good man,' and `a just man,' was formerly sheriff of Buncombe County. He died intestate on 11 August, 1916. The deeds involved were executed in 1913, when he was 79 years old. On 6 May, 1916, he was found, upon an inquisition of lunacy, to be incompetent to manage his own affairs and business. He had cancer for several years and went to Atlanta and had it removed, and in doing so lost one eye, part of his nose and cheek, and practically the whole side of his face, which was then covered with a plate, and when it was removed `one could see the eye socket and down his throat, making a pitiful looking sight. Then he became weak and run down, and during his latter days got weaker in mind and body.' The cancer reappeared a time or two after it was removed, and the flesh receded from the plate. Before the deeds were made his hearing became bad, it was hard to understand him or to be understood by him; his good eye became affected and his speech was difficult; he suffered with `swimming of head'; his recollection and judgment were bad; he couldn't call the names of his children; didn't recognize his children or grandchildren and other relatives, or his old friends, and he was incapacitated to transact ordinary business. His wife died in February, 1913, and from that time his body and mind failed more rapidly than before, and he had delusions about a fire being out and burning up everything, and about having sold a stack of hay for which he wanted to collect the money. He cried and complained about being bothered, and became so mentally weak that he pulled at his clothes, scattered and lost his bank certificates, amounting to $1,750, one being found at a log before the division and the other in weeds, on the second day of the survey; he forgot persons and conversations within a few minutes; didn't know about his cattle, and his actions and conduct made such an impression on persons with whom he associated that they said, `The old man is losing his mind'; that `Mr. Plemmons's mind is bad'; that `Sheriff *Page 674 
Plemmons was losing his mind,' and the report became general that `he was not competent to transact business.' In 1910 or 1911 the defendant, Canada Plemmons, and his brother Hilliary discussed the mental condition of the sheriff and the division of his property, and Canada stated `that they had waited too long because of the condition of father.'"
There was evidence that the division was unequal and unfair to the plaintiffs; that some of them had received more than their share, and, as to one of the defendants, that he recognized it and was willing to rectify it. There was also evidence of the commanding influence of the three defendants over Mr. Plemmons, and, further, that they employed it freely in effecting an unfair division in their favor. It also appeared that, at their suggestion, there was an inquisition of lunacy held to determine that Sheriff Plemmons was of sound mind and capable of making the deeds, the only witnesses being those who were brought there to give favorable testimony on an ex parte examination, the idea being to prepare themselves against any attack made upon the unequal division. There was evidence that Sheriff Plemmons, as he was called, desired all along to make a fair and equal division of his estate among his children, and that he was prevented from doing so by the interference of the three defendants, who the circumstances and fair inference therefrom tended to show held him in their power and under their control. There was this evidence as to the weakness of his mind and the treatment he received from those of the defendants with whom he lived at his home:
Rev. J. D. Colley testified: "I was going to church and he was sitting on the porch, and my wife was with me, and she hadn't been to church in a good bit, and she said, `Yonder is old sheriff,' and I said, `We will go down and see him', and we went and spoke to him, and he was in a way of weeping, and he said to us, `I don't know you,' something about that way, and I shook hands with him and he reached his hand and said, `Look here,' and his hands were all bruised and one of them was bleeding, and of course it touched my sympathy. He was a man I always liked, and I said, `How came that?' and he says, `These trifling boys did it,' and then Mrs. Murphy flew into a passion and said, `That is another lie,' and `It will go all up and down this creek now,' and I stepped out. It made me a little mad. That was about the remark. He told me that he had nothing; he says, `I have got no home and no money or anything.' He further said, `They have got all I have got away from me.' That was about a year before he died. I can't say whether it was before the guardian was appointed."
There was much other evidence as to his feebleness in mind and body and his susceptibility to be influenced by those who yet retained the full vigor of life. *Page 675 
The court rendered judgment upon the verdict, and defendants appealed.
After stating the case: There was objection to the issues, but we think they were proper and covered the entire scope of the inquiry, and were in no respect substantially different from those tendered by the defendants. It is not material in what form issues are submitted to the jury, provided they are germane to the subject of the controversy and each party has a fair opportunity to present his version of the facts and his view of the law, so that the case, as to all parties, can be tried on the merits. Deaver v.Deaver, 137 N.C. 246; Warehouse v. Osment [Ozment], 132 N.C. 839; Inre Herring's Will, 152 N.C. 258; Rakestraw v. Pratt, 160 N.C. 436, 437.
The jury here answered the first issue in the defendants' favor, and they cannot, therefore, rely in this Court upon exceptions taken by them at the trial which relate solely to that issue. Lyon v. A. C. L. Ry. Co.,165 N.C. 143; Hallman v. So. R. R. Co., 169 N.C. 127.
The declaration of Canada Plemmons was restricted to him, as, at the time they were admitted, the judge expressly cautioned the jury that "it could only be used as to him." What he said as to the inequality of the division could be competent only as to himself and his separate interest. The case, therefore, is not within the principle suggested in Linebarger v.Linebarger, 143 N.C. 229. See McRainey v. Clark, 4 N.C. 698; Ragland v.Huntingdon, 23 N.C. 561; King v. Inhabitants of Hardwick, 11 East., 589.
Such evidence as the declaration of one party upon a material matter which may prejudicially affect another party to the suit, who has a similar but separate interest therein, may generally be incompetent as to the latter, but here the judge carefully and explicitly cautioned the jury that the admission of Canada Plemmons' testimony could be used, if at all, only as against him, and it must be presumed that the jury so used it. We cannot assume, as the basis of an objection to be considered by this Court, that a jury have disobeyed the judge's instructions. If the defendants, other than Canada Plemmons, desired a more particular caution they should have asked for it, for example, that the admission be specially confined to the validity of the deed to Canada Plemmons. Rule of this Court, No. 27 (164 N.C. 438.) The jury could have found under the second issue, as it was framed, that Canada's deed was obtained by undue influence. Either party could have asked the court for such a special finding by the jury; but we do not think *Page 676 
that the ruling was harmful, if the evidence was incompetent, as there was really no serious dispute, or could not be, that there was an unequal division. That is apparent from the value placed upon the several tracts. All the plaintiffs' evidence surely tended to show an inequality, and the defendants' principal witnesses, O. L. Israel and J. H. Cole, testified to the same effect. O. L. Israel said, "I consider that he gave Canada and Mrs. Murphy more land than he gave to any of the other children." And J. H. Cole stated, "The piece of land given these orphan children was worth less than half of this piece of land given to Murphy." And further he testified as follows: "I heard Sheriff and Mrs. Plemmons discussing the division of the farm. Could not say date, but during her lifetime. They were around the fireside. They had some trouble about the division. He said she did not want to value the buildings at anything, as they were getting old, but he thought they were worth something. He said he meant for Mrs. Murphy to have the home place. There was no difference between him and Mrs. Plemmons as to that, but he wanted to value the buildings at something. He said his reason for giving her the home place was she was the baby child."
The defendant has argued that Mrs. Plemmons did exactly what he intended to do of his own free will, and the division, while unequal, was according to his sense of right and the exercise of a volition freed from any constraint, and there is evidence to support this view. So that we need not place our decision upon the technical competency of the evidence, as we think that in any view the ruling was without prejudice.
It is competent for a witness, after giving his opinion that the maker of a will or deed did not have mental capacity sufficient to execute it, to state the reasons for his opinion, even though they may involve personal transactions or communications with the deceased testator or grantor. This has been settled by numerous cases, the latest of which is Bissett v.Bailey, at this term (96 S.E. 648), and cases cited. See, also, Rakestrawv. Pratt, 160 N.C. 436; In re Stock's Will, 175 N.C. 224; In reChisman's Will, 175 N.C. 420.
It was said in Rakestraw v. Pratt, supra: "Plaintiffs proposed to prove same or substantially similar facts by Mrs. Martin, another sister, and the evidence was excluded, the court being of opinion that the testimony was incompetent under section 1631, Revisal, excluding, in certain cases, testimony of interested persons as to a transaction with deceased persons. The proposed evidence was in support of the opinion just given by these witnesses as to the mental incapacity of the mother and is not regarded as a `transaction' by our decisions construing the section referred to. InMcLeary v. Norment, 84 N.C. 235, the Court said: `Where a witness testifies to the want of mental capacity in a grantor to make a deed, and that his opinion was formed from conversations and *Page 677 
communications between the witness and grantor, it was held competent to prove the facts upon which such opinion was founded. Section 343 of the Code does not apply to the facts of this case.' Section 343 of the Code of that time corresponds to section 1631 of present Revisal."
There was ample evidence to show incapacity and undue influence. We need do no more than refer to the statement of the evidence already set out by us, as it is not required by the necessities of the case to dwell upon the details of this harrowing story. In re Will of Amelia Everett, 153 N.C. 83;Rakestraw v. Pratt, 160 N.C. 436; Causey v. R. R. Co., 166 N.C. 5;In re Will of Albert Mueller, 170 N.C. 28; Brown v. Brown, 171 N.C. 649. See, also, In re Craven's Will, 169 N.C. 561, where we held that undue influence is shown in procuring the execution of the instrument in question when there is such domination by the stronger over the weaker mind as to amount to the substitution of the will of the former for that of the latter, resulting in an unfair advantage over others entitled to the testator's favor, and who would naturally receive it but for the intervention of this designing and controlling influence. The doctrine, as applied to both wills and deeds, is substantially the same.
In the Everett case, supra, it was said: "General evidence of power over a testator, especially of weak mind or suffering from age and bodily infirmity, though not to such an extent as to destroy testamentary capacity, has been held in this country to be enough to raise a presumption that ought to be met and overcome before a will is allowed to be established. Robinson v. Robinson, 203 Pa. St., 403; Miller v. Miller, 187 Pa. St., 572; Boyd v. Boyd, 66 Pa., 283. In this last case, referring to the above rule, the Court says: `Particularly ought this to be the rule when the party benefited stands in a confidential relation with the testator.' Judge Redfield says: `Where the party to be benefited by the will has a controlling agency in procuring its execution, it is universally regarded as a very suspicious circumstance and one requiring the fullest explanation.' Wills, 515. This text has been adopted and approved generally by the courts of this country. 27 A. E. Enc., 438; Gardner on Wills, 189. Prof. Wigmore says: `Where the grantee or other beneficiary of a deed or will is a person who has maintained intimate relations with the grantor or testator, or has drafted or advised the terms of the instrument, a presumption of undue influence or of fraud on the part of the beneficiary has often been applied.' Section 2503 and cases cited in note. The Court of Appeals of Virginia declares: `When a will executed by an old man differs from his previously expressed intentions and is made in favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of undue influence *Page 678 
which should be overcome by satisfactory testimony.' Hartman v. Strickler,82 Va. 238; Whitelaw v. Sims, 90 Va. 588; 1 Jarman Wills, 71, 72. Undue influence is generally proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its existence."
Undue influence is generally classed under the head of fraud, and so treated by the approved text-writers and by the decisions of the courts. When such influence is exercised for a sordid purpose, of which there is some evidence in this case, it is palpably fraudulent. Look not upon your neighbor's goods with a covetous eye is not only a biblical injunction, but is as well a principle of the law which enters into the investigation of such questions as we have here, and has a potent influence sometimes in deciding them. This man who stood well in his county and among his neighbors for many years, and occupied a place of the highest honor, so that it may well be said that he was a leader among his people, had lost the natural vigor of mind and body by extreme old age and the terrible ravages of disease, which had eaten away one-half of his face, destroyed one eye, and greatly impaired his sense of hearing, and so deeply had it embedded itself in the tissues and bones and gradually destroyed them that one witness testified, "You could look down his throat." His face was horribly disfigured. Is it to be wondered at that his faculties were prostrated and his memory became so bad that he did not even know his own offspring, and that he grew to be childish and forgetful, and became an easy victim to the undue importunities and machinations of the selfish and artfully designing.
A father may have favorites among his children because some, more than others, have favored him in his old age when, by reason of his infirmities, he needed their watchful care and attention. They may properly, but not unduly, use moral persuasion to obtain what they think they may deserve, a larger share of his bounty than the others, who are not justly entitled to so much.
We said in the Craven Will case (169 N.C. at p. 570): "It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection or of the power of rewarding those who bestow it. These views were strongly approved and commended by the Court inMackall v. Mackall, 135 U.S. 167 (34 L.Ed., at p. 84), where the conclusion was reached that, in a legal sense, undue influence must destroy free agency. `It is well settled,' said Justice Brewer, `that in order to avoid a will on the ground of undue influence, it must appear that the testator's free agency was destroyed, and that his will was overborne by excessive importunity, imposition or fraud, so that the will does not, in fact, express his wishes as to the disposition of *Page 679 
his property, but those of the persons exercising the influence.' The Court then also used language closely applicable to the facts in our case: `That the relations between this father and his several children during the score of years preceding his death naturally inclined him towards the one and against the others is evident, and to have been expected. It would have been strange if such a result had not followed; but such partiality towards the one, and influence resulting therefrom, are not only natural, but just and reasonable, and come far short of presenting the undue influence which the law denounced. Right or wrong, it is to be expected that a parent will favor the child who stands by him, and to give to him, rather than the others, his property. To defeat a conveyance under those circumstances something more than the natural influence springing from such relationship must be shown; imposition, fraud, importunity, duress, or something of that nature, must appear; otherwise that disposition of property which accords with the natural inclinations of the human heart must be sustained.' And more apt are the words of this Court in Wessell v. Rathjohn, 89 N.C. 382, as the relation there was that of father and daughter." But while the law does not forbid fair appeal to the parent's sense of gratitude in order to obtain a larger share of his bounty, it strongly condemns an undue, dishonest and fraudulent advantage which is taken of the weak and infirm to secure any favor from him in the distribution of his estate among his children. It is wrong in morals and is sternly forbidden by the law.
In this case the jury, under the fair and impartial charge of JudgeMcElroy, and upon evidence which clearly warranted the conclusion, have found that the defendants unitedly practiced such a fraud upon this old, feeble and wretched man, who, instead, should have received from them their tender devotion and care in his last days, which were filled with so much of sorrow, affliction and distress. All this aggravates the wrong that has been done, but the law does not penalize it, and only requires that it shall be righted and the property be restored for a fair division among those who were at least legally entitled to their father's consideration and bounty.
We have not stated the case against the defendants as strongly as the evidence permitted and justified, but sufficiently so to describe some of the leading facts which tended to show the fraud, and which are enough to sustain the verdict as against a motion to nonsuit. The plaintiffs are entitled to have the evidence presented in the best view for them to the exclusion of any that is favorable to the defendants, who did not favor the court and a jury with their own version of the facts as witnesses in their own behalf or offer any explanation of circumstances, which give rise to grave suspicions, not to say more. *Page 680 
We have confined ourselves to those exceptions which we deemed to be material and of sufficient importance for discussion. The others are without any merit.
A careful review and investigation of the case discloses no error in the trial.
No error.