CHARLES C. HENDRICKS, INDIVIDUALLY AND AS ONE OF THE EXECUTORS OF
THE WILL OF DANIEL J. HENDRICKS, DECEASED, JAMES R. HEN-
DRICKS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF SARAH
DAVIS HENDRICKS, DECEASED, AUSTIN H. HENDRICKS, RUTH H.
SUTTLES, AND AILEEN H. McCULLOCH, v. D. J. HENDRICKS, JR.,
INDIVIDUALLY AND AS ONE OF THE EXECUTORS OF THE WILL OF DANIEL J.
HENDRICKS, DECEASED, AND WIFE, ELIZABETH P. HENDRICKS, H.
MONROE HENDRICKS, INDIVIDUALLY AND AS ONE OF THE EXECUTORS OF
THE WILL OF DANIEL J. HENDRICKS, DECEASED, AND WILLIAM O.
HENDRICKS.

(Filed 12 January, 1968.)

**1. Deeds § 4—**

The test of the mental capacity to execute a valid deed is whether the
grantor understood the nature and consequences of his act in making the
deed, and whether he knew what land he was disposing of and to whom.

**2. Same;   Evidence §§ 41, 43—**

The mental capacity to make a deed is not a question of fact, but is
a conclusion which the law draws from certain facts as a premise, and
a nonexpert witness may not testify that a grantor lacked sufficient
mental capacity to make a deed, since the presence or absence of mental
capacity is the very question for the jury.

**3. Cancellation and Rescission of Instruments § 9—**

Where one occupies a confidential relationship with another and bene-
fits from a transaction with the other in such a way that the circum-
stances create a strong suspicion that an undue or fraudulent influence
has been exerted, the burden is upon the grantee or beneficiary to re-
move the suspicion by offering proof that the transaction was the free
and voluntary act of the grantor.

**4. Cancellation and Rescission of Instruments § 3;   Fraud § 3—**

The term "confidential relationship" implies a preferential position,
and while the children in a family ordinarily enjoy a confidential rela-
tionship with their father, the mere relationship of parent and child
does not raise the presumption of undue influence or of fraud.

**5. Cancellation and Rescission of Instruments § 10—   Evidence held in-
sufficient to show that deed was procured by undue influence.**

Evidence tending to show that a son lived near his father's homeplace,
helped his father farm at the latter's request with the understanding that
the farm was someday to be his, that the father had made a similar offer
to his other sons, that another son lived in the house with the father and
that other sons frequently visited the father and discussed with him his
business affairs, *is held* insufficient to show that the first son occupied such
a superior or preferential position with his father as to raise the pre-
sumption of undue influence in the execution of a deed from the father
to the son, and an instruction that it raised such presumption is erroneous.

**6. Trial § 33—**

It is error for the court to charge on an abstract principle of law not
supported by any evidence in the case.

SHARP, J., dissenting.

BOBBITT, J., joins in the dissenting opinion.

APPEAL by defendants from *Crissman, J.*, presiding at the 15 May 1967 Civil Session, Superior Court of GUILFORD County, High Point Division.

Mr. Daniel J. Hendrick, Sr. who died 22 September 1965 was married twice. Four children were born to each marriage. The plaintiffs herein are the children of the second marriage together with Aileen H. McCulloch who was the child of the first marriage. The three defendants are the children of the first marriage. Mr. Hendricks left a will in which Charles C. Hendricks (one of the plaintiffs), D. J. Hendricks, Jr. and H. Monroe Hendricks (defendants) were named as executors of his estate, and all of them have qualified in that capacity. Mr. Hendricks devised all of the real estate owned by him at the time of his death to his wife, Sarah Davis Hendricks, for the duration of her life, with the vested remainder therein equally in fee simple to his eight children, each one of whom is a party, either plaintiff or defendant, to this action. Mrs. Hendricks was adjudged incompetent 6 October 1965 and died 25 November 1965, the result being that under the will each of the plaintiffs and defendants is the owner of one-eighth undivided interest in the real estate of the deceased.

Prior to 15 April 1965, Mr. Hendricks was the owner of four adjoining tracts of land lying in Guilford and Randolph Counties, totaling one-hundred twenty acres and containing a dwelling house and farm buildings. On that date he executed and delivered to his son D. J. Hendricks, Jr. a deed in which sixty-four acres of the farm were conveyed, so that at the time of his death he retained approximately fifty-six acres of the farm.

The deed was not recorded until 15 August 1965, and in less than a month his son Charles (one of the plaintiffs) instituted proceedings to have his father declared incompetent. The father died before the date set for the inquisition.

This action was instituted 3 December 1965, the plaintiffs alleging that at the time of the execution of the deed to D. J. Hendricks, Jr. (Jay), Mr. Hendricks did not have sufficient mental capacity to do so, and also that the deed was procured by the exercise of undue influence over his father by Jay. They prayed that the deed be set aside on those grounds which would have resulted in all of the parties owning a one-eighth undivided interest in the entire farm of one hundred twenty acres.

The plaintiffs offered the testimony of ten witnesses as to the mental capacity of their father at around the time of the execution of the deed. In summary, it tended to show that Mrs. Hendricks broke her hip in January 1965 and was taken to the hospital where she stayed for some time, then moved to another one in Chapel Hill,

and then to the home of James Richard Hendricks, her son who lived in Chapel Hill. She did not return to her own home before her death. Mr. Hendricks was seriously concerned about the health of his wife and the financial problems presented by her hospital and medical expenses.

A family meeting was held on 7 February 1965 to consider this situation, and it was decided to sell the farm if necessary to meet expenses. After the meeting, Jay protested to some members of the family that the land had been promised to him because he had stayed on the farm and worked it and "he was going to have it one way or the other." Another family meeting was called to discuss Jay's claim; and when Mr. Hendricks was told of it he said, "if he owed Jay anything extra over what the other seven were supposed to have, that he had give[n] him a lot over there, and if he owed him anything extra, that was it." The plaintiffs denied that any of them had; ever been offered the farm by their father if they would stay and look after it.

The plaintiffs offered evidence tending to show that Mrs. Hendricks' illness caused a decline in Mr. Hendricks' mental and physical condition; that at the time of the execution of the deed in April his physical disabilities included diabetes, cataracts, prostate trouble, hardening of the arteries and that mentally he had deteriorated in his memory and was senile, confused and abnormal. In response to a question discussed in the opinion, eight of the plaintiffs' witnesses answered that in their opinion Mr. Hendricks did not possess the mental awareness requisite to the making of a deed.

The plaintiffs offered the testimony of Mr. Joseph Greene who described the execution of the deed by Mr. Hendricks but who was not asked his opinion of the latter's mental condition at that time. They further presented testimony that Mr. Hendricks had not asked the plaintiffs, or any of them, to stay on the farm and work it in which event he would convey it to them.

The defendants offered the testimony of twenty-seven witnesses, many of whom testified that on or shortly before and after April 15 Mr. Hendricks, while in feeble health and of poor eyesight, knew what he was doing, knew the land he was conveying and to whom. None testified that he did not.

Twelve days after the deed to Jay was executed, Mr. and Mrs. Hendricks executed a timber deed by making their marks. It was confirmed and approved by all the children in a writing attached to the deed. The defendants testified that this confirmation was required because Mrs. Hendricks was an invalid at this time. The grantee of the timber deed testified that when he saw Mr. Hendricks a few days before the timber deed was executed, in his opinion, he had

sufficient understanding to understand what he was doing in making a deed, to understand the nature and consequences of his act in making a deed, and to know what land he was disposing of, to whom and how. Charles, the only plaintiffs' witness to testify in regard to this deed, stated: "The children agreed to the timber deed after my mother suffered the stroke and had a broken hip. Yes, she was impaired both mentally and physically. That is the reason we agreed to sell the timber." This deed is not under attack.

The evidence pertaining to the background and execution of the deed was presented primarily by the defendants. D. J. Hendricks, Jr., the grantee in the disputed deed, testified that his father had told him if he would stay and help him farm, he could have the farm when he was through with it; and further, he said: "I will give all of them [the other children] a lot to build a home on and they will understand that." Jay asked his father to give the other children the same opportunity, but in 1939 Mr. Hendricks said none of them would farm so Jay accepted his father's offer to operate the farm and did so "from then on."

Further reference will be made to the evidence for the defendants in the opinion.

After the defendants had presented their evidence, the plaintiffs offered rebuttal evidence, including that of Aileen McCulloch, a daughter of the first marriage. On recall she testified that on the second Sunday in April her father told her Jay was "aggravating me to death about it [giving him the farm]"; and "my father was not all right on April 11, 1965. Part of the time he knew what he was talking about and part not. The jury will have to work [it] out for themselves."

The court submitted the following issues to the jury:

"1.  Did Daniel J. Hendricks, Sr., on April 15, 1965, possess sufficient mental capacity to execute the deed conveying sixty-four acres of land, more or less, to the defendant, Daniel J. Hendricks, Jr.?

"2.  Was the execution of said deed procured by undue influence on the part of Daniel J. Hendricks, Jr.?"

Both issues were answered in favor of the plaintiff, judgment was signed on the verdict, and the defendants appealed.

*Jordan, Wright, Henson & Nichols by Edward F. Murrelle, Attorneys for defendant appellants.*

*Cooke & Cooke by Arthur O. Cooke and William Owen Cooke, Attorneys for plaintiff appellees.*

PLESS, J.   The plaintiffs asked several of the witnesses introduced by them, "Do you have an opinion satisfactory to yourself as to whether or not Daniel J. Hendricks . . . had sufficient mental capacity to understand the nature and consequences of making a deed, its scope and effect, and know what land he was disposing of and to whom and how?" Over the objection of the defendants, the witnesses were permitted to say that they had such an opinion and that he (Mr. Hendricks) "did not." The plaintiffs, Charles C. Hendricks, Austin H. Hendricks and Mrs. Aileen H. McCulloch so testified. In addition, Walter Hiatt, a nephew, Marshall Williard, Mrs. Sarah Haworth, Dr. William H. Flythe and Mrs. J. T. Adams answered the same question favorably to the plaintiffs over the objection of the defendants.

We have consistently held that the test is whether or not the maker "understood what he was doing, the nature and consequences of his act and whether he knew what land he was disposing of, to whom and how." A similar test is provided in cases involving the execution of a will. "The rule is well established that a nonexpert witness may not be permitted to make the abstract statement that a grantor 'did not have sufficient mental capacity to make a deed.' This is so for the reason that mental capacity to make a deed is not a question of fact . . . it is a conclusion which the law draws from certain facts as a premise. . . ." *McDevitt v. Chandler,* 241 N.C. 677, 86 S.E. 2d 438.

In *McDevitt, supra,* we awarded a new trial because the questions admitted included phrases that the grantor "did not have sufficient mental capacity to make a deed." The presence or absence of mental capacity is the very question for the jury, and as such a nonexpert witness may not give an opinion on it but may testify only to the predicate facts (and opinions) from which the jury may draw the conclusion. 3 Strong, N. C. Index 2d, Evidence § 41. To hold otherwise would allow an invasion of the province of the jury. "[I]t is improper for nonexpert witnesses to testify that in their opinion a testator did or did not have the mental capacity to make a will." *In Re Will of York,* 231 N.C. 70, 55 S.E. 2d 791.

> "[A] person has mental capacity sufficient to contract if he knows what he is about (*Moffit v. Witherspoon,* 32 N.C. 185; *Paine v. Roberts,* 82 N.C. 451), . . . [T]he measure of capacity is the ability to understand the nature of the act in which he is engaged and its scope and effect, or its nature and consequences, not that he should be able to act wisely or discreetly, nor to drive a good bargain, but that he should be in such possession of his faculties as to enable him to know at least

what he is doing and to contract understandingly." *Goins v. McLoud,* 231 N.C. 655, 58 S.E. 2d 634.

The plaintiff's evidence in regard to the facts relating up to the execution of the deed are rather well summarized in the evidence of Mrs. Aileen McCulloch, one of the plaintiffs, who stated that her father told her that Jay was "aggravating him to death about it." The only witness offered by the plaintiffs as to the actual event was Mr. Joseph Greene, a notary public, who testified that on two or three occasions before April 15 Jay spoke to him about notarizing a deed, that his father was sick at times, "and some time when he felt good he would come by and get me and go down." Mr. Greene further testified:

"On April 15, 1965 [Jay] came to me and requested I notarize a document. . . . When I arrived at the homeplace, I did not go in immediately. . . . [Jay] was already there. He came out to my automobile when I drove up and said he wanted me to fix that paper, and he would go in in a minute and come back out and . . . I waited in my car . . . just a minute or two. . . . [Jay] just told his daddy . . . that the man was 'here to fix the paper.' I didn't know Mr. Hendricks, Sr., but I presumed it was him, so he took the paper to him, and I guess he was blind . . . he agreed to it, as far as I could tell, and he [Jay] put his hand on the right line for him and made an 'X'. . . . During the time I was in the house, Daniel J. Hendricks, Sr. didn't say anything. . . . [H]e was just sitting in a chair. He never did get up. I can't exactly describe him. I didn't have any idea of anything like this, and really didn't have any interest in the thing. . . . I don't remember whether his hand shook when he attempted to make this 'X'. . . . I was probably there . . . maybe ten minutes. . . . [Jay] paid the notary fee of a dollar. . . . Daniel J. Hendricks, Sr. said nothing during all this time. . . . While I was there, Mr. Raymond Robertson signed the deed as a witness."

The defendant Jay Hendricks, in summary, testified as follows: His father had told him if he would stay and help him farm, he could have the farm when he was through with it; and further, he said: "I will give all of them [the other children] a lot to build a home on and they will understand that." Jay asked his father to give the other children the same opportunity, but in 1939 Mr. Hendricks said none of them would farm so Jay accepted his father's offer to operate the farm and did so "from then on".

Monroe Hendricks testified that he graduated from the University of North Carolina, taught school for twenty years, then returned home in 1948 and had lived there continuously since that time with his father and stepmother. "My father did offer me this farm if I would look after it and cultivate it. . . . He did make a similar offer [to D. J. Hendricks, Jr.] . . . [and] to Bill and to Charles, and to Austin, and I am not sure about Richard." He testified that Jay stayed on the farm and ran it for the last twenty years of his father's life, that he furnished all the machinery, cars for the family, and generally relieved his parents of the responsibility of operating the farm. Monroe testified that his father requested him to get his old deeds sometime prior to April 15 and "he said he wanted them to convey Jay some farm land, the farm land that he had promised him." Monroe got the deeds from a little tin box in his father's room and gave them to the latter. Later, the father in the presence of Monroe gave the deeds to Jay and "told him to have the deeds made so he could sign them, have the deed made, so he could sign them." When the deed was signed, the notary came in and said he was ready to notarize the deed. "Dad got up to the table from his chair, walked over to the table, and he wanted to know where he should sign, and I directed his hand. . . . I steadied his hand as he made the mark. Dad made the mark. Yes, I steadied his hand. The Notary wrote his name, 'D. J. Hendricks.' After that was done, my father made the mark with me holding his hand steady. . . . Mr. D. J. Hendricks, Jr. had nothing to do with my father's making his mark. He did not hold my father's hand when the mark was made, and I am certain that it was I, not Mr. D. J. Hendricks, Jr." Monroe described the mental and physical condition of his father saying that until his father had the stroke (8 May 1965) that his father was able to go for rides, visited his wife at Chapel Hill a couple of times and that in his opinion his father knew the effect of his signing the deed; that he knew who the deed was going to and had been knowing it for years. "He had requested that [the deed] to be prepared several times before it was done."

Mr. Raymond Robertson testified for the defendant saying that the deceased was his uncle; that he saw the deceased before the deed was actually signed, and that at that time Mr. Hendricks said he wanted to make D. J. Hendricks, Jr., a deed, that he was going to make him (Jay) a deed to some property. Later, Robertson went again to the home of the deceased and witnessed the execution of the deed. "I was present when Mr. D. J. Hendricks, Sr. made his mark. He made the mark with Monroe holding his hand at the proper place. He told Monroe he couldn't see where to make the mark, and

he asked him to help him. To my knowledge, Mr. D. J. Hendricks, Jr. did not have anything to do with helping Mr. D. J. Hendricks, Sr. make the mark. He didn't help him in any way that I noticed." The witness further testified, in effect, that the deceased understood what he was doing, the nature and consequences of his act in making the deed; that he knew what land he was disposing of, to whom he was disposing of it, and how he was disposing of it. "My opinion is that his mental condition was very good. I think he had the capacity to do it."

William O. Hendricks, brother of Jay, testified, among other things, "I knew the arrangement between my father and [Jay]. . . . [M]y father told me about the arrangement. . . . I was not surprised that the deed had been made because I knew it was under contract to be made. . . . He [his father] had sufficient understanding to know what he was doing, the nature and consequences of his act in making the deed, what land he was disposing of, to whom and how. . . . [M]y opinion is that he had the understanding to know those things."

It will be noted that William and Monroe were testifying against their own interest in that if the deed was set aside each would get one-eighth undivided interest in the sixty-four acres conveyed to Jay.

Unless the rule in *McNeill v. McNeill,* 223 N.C. 178, 25 S.E. 2d 615, is applicable, the evidence in this case will not support an issue of undue influence. In that opinion it is said that where one occupies a confidential relationship with another and benefits from a transaction that "such circumstances create a strong suspicion that an undue or fraudulent influence has been exerted, and then the law casts upon him the burden of removing the suspicion by offering proof that the will was the free and voluntary act of the testator." The term "confidential relationship" implies a preferential position. All of the children in a family ordinarily occupy a confidential relationship with their father, but as said in *Walters v. Bridgers,* 251 N.C. 289, 111 S.E. 2d 176, the relation of parent and child does not raise the presumption of fraud, nor does it constitute a fiduciary or confidential relationship requiring the beneficiary to establish lack of duress or undue influence in their dealings. To bring the *McNeill* ruling into play, relationship would have to be shown as more intimate and influential than the other children enjoy. Here, it is shown that Monroe lived in the house with his father while Jay lived a mile or so away. Charles testified that he visited his father at least once a week, usually spent a month with him during the summer, and that he and his father frequently discussed the affairs of the

farm and of the father's business. Austin, another son, testified that he was in his father's home three and four times a week and visited at all times of the day and night. From the record we can find nothing to sustain the claim that Jay occupied a superior position with his father or had more control over his actions than did his brothers, and we are of the opinion that the submission of this issue constitutes prejudicial error. *Cathey v. Shope,* 238 N.C. 345, 78 S.E. 2d 135; *Vann v. Barefoot,* 249 N.C. 22, 105 S.E. 2d 104.

In *Plemmons v. Murphey,* 176 N.C. 671, 97 S.E. 648, it is said:

> "A father may have favorites among his children because some, more than others, have favored him in his old age when, by reason of his infirmities, he needed their watchful care and attention. They may properly, but not unduly, use moral persuasion to obtain what they think they may deserve, a larger share of his bounty than the others, who are not justly entitled to so much.

> "We said in the *Craven Will* case (169 N.C. at p. 570) [*In re Craven's Will,* 169 N.C. 561, 86 S.E. 587]: 'It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection or of the power of rewarding those who bestow it. These views were strongly approved and commended by the Court in *Mackall v. Mackall,* 135 U.S. 167 (34 L. Ed. at p. 84), where the conclusion was reached that, in a legal sense, undue influence must destroy free agency. "It is well settled," said Justice Brewer, "that in order to avoid a will on the ground of undue influence, it must appear that the testator's free agency was destroyed, and that his will was overborne by excessive importunity, imposition or fraud, so that the will does not, in fact, express his wishes as to the disposition of his property, but those of the persons exercising the influence." The Court then also used language closely applicable to the facts in our case: "That the relations between this father and his several children during the score of years preceding his death naturally inclined him towards the one and against the others is evident, and to have been expected. It would have been strange if such a result had not followed; but such partiality towards the one, and influence resulting therefrom, are not only natural, but just and reasonable, and come far short of presenting the undue influence which the law denounced. Right or wrong, it is to be expected that a parent will favor the child who stands by him, and to give to him, rather than the others, his property. To defeat a conveyance under

those circumstances something more than the natural influence springing from such relationship must be shown; imposition, fraud, importunity, duress, or something of that nature, must appear; otherwise that disposition of property which accords with the natural inclinations of the human heart must be sustained." ' "

The case of *Willetts v. Willetts,* 254 N.C. 136, 118 S.E. 2d 548, is quite similar to this one. In it the father made a deed to his son for a valuable tract of land, and after his death his brothers and sisters attempted to set it aside upon the grounds of undue influence. The evidence showed that the son assisted his father in farming and in marketing his crops and livestock; that his father often requested the son's advice in connection with his business affairs, and that he listed his father's land for taxes as agent of his father. The lower court allowed motion for nonsuit which was affirmed, the court saying that the doctrine in *McNeill v. McNeill, supra,* did not apply.

The defendants take exception to the following part of the Court's charge:

"It is very generally held that when a will or a deed is executed through the *intervention* of a person occupying a *confidential relation* to the maker of the instrument, whereby such a person becomes a large beneficiary, the circumstances create strong suspicion that undue influence has been exerted.

"Where the grantee or other beneficiary of a deed or will is a person who has maintained *intimate relations* with the grantor, or the testator, or has *drafted* or *advised* the terms of the instrument, a presumption of undue influence, or of fraud, on the part of the beneficiary has often been applied." (Emphasis added.)

These instructions are improper for two reasons. First, they do not require that the jury find that a confidential or intimate relationship existed between Jay and his father but assume that it did. Second, there being no evidence tending to show a confidential relationship, it comes within the inhibition of *Carswell v. Lackey,* 253 N.C. 387, 117 S.E. 2d 51, in which we have stated that a correct legal instruction constitutes error where not applicable to the facts and the evidence of a case, which is the situation we have here.

The defendants take exception to several statements made by the trial judge in attempting to get witnesses to answer the questions propounded. An examination of the record shows that in each instance the admonition was correct and justified. We cannot limit the

authority of the judge to require the witnesses to respond to the questions rather than arguing the matter, and these exceptions are without merit.

Nevertheless, we are of the opinion that the incompetent evidence admitted upon the first issue and the submission of the issue of undue influence, and the instructions thereon, constitute reversible error, and that the defendants are entitled to a

New trial.

SHARP, J., dissenting: By its answer to the two issues submitted, the jury determined (1) that Daniel J. Hendricks, Sr., on 15 April 1965, lacked mental capacity to execute the deed to defendant Daniel J. Hendricks, Jr., which plaintiffs seek to set aside, and (2) that the deed was procured by the undue influence of Daniel J. Hendricks, Jr. The answer to either issue is sufficient to support the judgment setting the deed aside. Therefore, even if it be conceded *arguendo* that the submission of the issue of undue influence was not warranted by the evidence; that incompetent hearsay declarations of the grantor tending to establish undue influence were admitted; and that there was error in the charge with reference to the second issue, these errors did not affect the first issue. The challenged declarations of the grantor were to the effect that he had not promised defendant-grantee anything; that if he owed him anything extra he had given him a building lot. Defendants state in their brief that his statement, "rather than revealing a man who *lacks* mental capacity, shows a man who is very much in control of the situation. It tends to prove, rather than to disprove, adequate mental capacity." The admission of this evidence, therefore, did not prejudice defendant on the first issue. Neither, in my opinion, did the submission of the second issue and the charge with reference to it.

The majority, however, would vacate the jury's verdict upon the first issue because the judge permitted witnesses for plaintiff to answer the following question:

". . . [D]o you have an opinion satisfactory to yourself as to whether or not Daniel J. Hendricks on these occasions when you did see him between 29 January 1965 and 15 April 1965 had sufficient mental capacity to understand the nature and consequences of making a deed, its scope and effect, and know what land he was disposing of, and to whom, and how?"

All question of grammar aside, this question is phrased in substantial compliance with the rule laid down in *McDevitt v. Chandler,* 241 N.C. 677, 86 S.E. 2d 438 — the case upon which the majority relies to award a new trial. In *McDevitt,* the question which the court

condemned was asked by the trial judge himself and was: "Is it your opinion on that day she didn't have sufficient mental capacity to make a deed?" In awarding a new trial this court said that a witness may not make the abstract statement that a grantor "did not have sufficient mental capacity to make a deed," because such capacity is a conclusion which the law draws from certain facts as a premise. These facts are: "[w]hether the grantor understood what he was doing — *the nature and consequences of his act in making the deed;* that is, whether he knew what land he was disposing of, to whom, and how." *Id.* at 680, 86 S.E. 2d at 440. (Emphasis added.) Analysis reveals no difference between the foregoing rule from *Mc-Devitt* and the question propounded to plaintiffs' witness in this case. The question here also complies with the test for contractual capacity quoted in the majority opinion from *Goins v. McLoud,* 231 N.C. 655, 58 S.E. 2d 634.

It is noted that in *Goins v. McLoud, supra,* a suit also involving the validity of the deed, the jury found (1) that the grantor lacked mental capacity to execute the deed and (2) that its execution had been procured by fraud and undue influence. On appeal, this court found error affecting the first issue but not the second. A trial *de novo* was ordered because the court thought the question of undue influence and fraud was, in both the complaint and evidence in that case, so tied up with the mental condition of the grantor that it was the strongest factor leading to the answer to the second issue. Such is not the situation here. I vote to sustain the judgment entered in the court below.

BOBBITT, J., joins in the dissenting opinion.