158 S.E.2d 496 (1968)
272 N.C. 340
Charles C. HENDRICKS, Individually and as one of the Executors of the Will of Daniel J. Hendricks, Deceased, James R. Hendricks, Individually and as Administrator of the Estate of Sarah Davis, Hendricks, Deceased, Austin H. Hendricks, Ruth H. Suttles, and Aileen H. McCulloch
v.
D. J. HENDRICKS, Jr., Individually and as one of the Executors of the Will of Daniel J. Hendricks, Deceased, and wife, Elizabeth P. Hendricks, H. Monroe Hendricks, Individually and as one of the Executors of the Will of Daniel J. Hendricks, Deceased, and William O. Hendricks.
No. 693.
Supreme Court of North Carolina.
January 12, 1968.
*499 Jordan, Wright, Henson & Nichols, by Edward L. Murrelle, Greensboro, for defendant appellants.
Cooke & Cooke, by Arthur O. Cooke and William Owen Cooke, Greensboro, for plaintiff appellees.
PLESS, Justice.
The plaintiffs asked several of the witnesses introduced by them, "Do you have an opinion satisfactory to yourself as to whether or not Daniel J. Hendricks * * * had sufficient mental capacity to understand the nature and consequences of making a deed, its scope and effect, and know what land he was disposing of and to whom and how?" Over the objection of the defendants, the witnesses were permitted to say that they had such an opinion and that he (Mr. Hendricks) "did not." The plaintiffs, Charles C. Hendricks, Austin H. Hendricks and Mrs. Aileen H. McCulloch so testified. In addition, Walter Hiatt, a nephew, Marshall Williard, Mrs. Sarah Haworth, Dr. William H. Flythe and Mrs. J. T. Adams answered the same question favorably to the plaintiffs over the objection of the defendants.
We have consistently held that the test is whether or not the maker "understood what he was doing, the nature and consequences of his act and whether he knew what land he was disposing of, to whom, and how." A similar test is provided in cases involving the execution of a will. "The rule is well established that *500 a nonexpert witness may not be permitted to make the abstract statement that a grantor `did not have sufficient mental capacity to make a deed.' This is so for the reason that mental capacity to make a deed is not a question of fact * * * it is a conclusion which the law draws from certain facts as a premise * * *." McDevitt v. Chandler, 241 N.C. 677, 86 S.E.2d 438.
In McDevitt, supra, we awarded a new trial because the questions admitted included phrases that the grantor "did not have sufficient mental capacity to make a deed." The presence or absence of mental capacity is the very question for the jury, and as such a nonexpert witness may not give an opinion on it but may testify only to the predicate facts (and opinions) from which the jury may draw the conclusion. Strong, N.C. Index 2d, Evidence § 41. To hold otherwise would allow an invasion of the province of the jury. "[I]t is improper for nonexpert witnesses to testify that in their opinion a testator did or did not have the mental capacity to make a will." In re Will of York, 231 N.C. 70, 55 S.E.2d 791.
"[A] person has mental capacity sufficient to contract if he knows what he is about (Moffit v. Witherspoon, 32 N.C. 185; Paine v. Roberts, 82 N.C. 451), * * * [T]he measure of capacity is the ability to understand the nature of the act in which he is engaged and its scope and effect, or its nature and consequences, not that he should be able to act wisely or discreetly, nor to drive a good bargain, but that he should be in such possession of his faculties as to enable him to know at least what he is doing and to contract understandingly." Goins v. McLoud, 231 N.C. 655, 58 S.E.2d 634.
The plaintiffs evidence in regard to the facts relating up to the execution of the deed are rather well summarized in the evidence of Mrs. Aileen McCulloch, one of the plaintiffs, who stated that her father told her that Jay was "aggravating him to death about it." The only witness offered by the plaintiffs as to the actual event was Mr. Joseph Greene, a notary public, who testified that on two or three occasions before April 15 Jay spoke to him about notarizing a deed, that his father was sick at times, "and some time when he felt good he would come by and get me and go down." Mr. Greene further testified:
"On April 15, 1965 [Jay] came to me and requested I notarize a document. * * * When I arrived at the homeplace, I did not go in immediately. * * [Jay] was already there. He came out to my automobile when I drove up and said he wanted me to fix that paper, and he would go in in a minute and come back out and * * * I waited in my car * * * just a minute or two. * * * [Jay] just told his daddy * * that the man was `here to fix the paper.' I didn't know Mr. Hendricks, Sr., but I presumed it was him, so he took the paper to him, and I guess he was blind * * * he agreed to it, as far as I could tell, and he [Jay] put his hand on the right line for him and made an `X' * * *. During the time I was in the house, Daniel J. Hendricks, Sr. didn't say anything. * * * [H]e was just sitting in a chair. He never did get up. I can't exactly describe him. I didn't have any idea of anything like this, and really didn't have any interest in the thing. * * * I don't remember whether his hand shook when he attempted to make this `X'. * * * I was probably there * * * maybe ten minutes. * * * [Jay] paid the notary fee of a dollar. * * * Daniel J. Hendricks, Sr. said nothing during all this time. * * * While I was there, Mr. Raymond Robertson signed the deed as a witness."
The defendant Jay Hendricks, in summary, testified as follows: His father had told him if he would stay and help him farm, he could have the farm when he *501 was through with it; and further, he said: "I will give all of them [the other children] a lot to build a home on and they will understand that." Jay asked his father to give the other children the same opportunity, but in 1939 Mr. Hendricks said none of them would farm so Jay accepted his father's offer to operate the farm and did so "from then on".
Monroe Hendricks testified that he graduated from the University of North Carolina, taught school for twenty years, then returned home in 1948 and had lived there continuously since that time with his father and stepmother. "My father did offer me this farm if I would look after it and cultivate it. * * * He did make a similar offer [to D. J. Hendricks, Jr.] * * * [and] to Bill and to Charles, and to Austin, and I am not sure about Richard." He testified that Jay stayed on the farm and ran it for the last twenty years of his father's life, that he furnished all the machinery, cars for the family, and generally relieved his parents of the responsibility of operating the farm. Monroe testified that his father requested him to get his old deeds sometime prior to April 15 and "he said he wanted them to convey Jay some farm land, the farm land that he had promised him." Monroe got the deeds from a little tin box in his father's room and gave them to the latter. Later, the father in the presence of Monroe gave the deeds to Jay and "told him to have the deeds made so he could sign them, have the deed made, so he could sign them." When the deed was signed, the notary came in and said he was ready to notarize the deed. "Dad got up to the table from his chair, walked over to the table, and he wanted to know where he should sign, and I directed his hand. * * * I steadied his hand as he made the mark. Dad made the mark. Yes, I steadied his hand. The Notary wrote his name, `D. J. Hendricks'. After that was done, my father made the mark with me holding his hand steady. * * * Mr. D. J. Hendricks, Jr. had nothing to do with my father's making his mark. He did not hold my father's hand when the mark was made, and I am certain that it was I, not Mr. D. J. Hendricks, Jr." Monroe described the mental and physical condition of his father saying that until his father had the stroke (8 May 1965) that his father was able to go for rides, visited his wife at Chapel Hill a couple of times and that in his opinion his father knew the effect of his signing the deed; that he knew who the deed was going to and had been knowing it for years. "He had requested that [the deed] to be prepared several times before it was done."
Mr. Raymond Robertson testified for the defendant saying that the deceased was his uncle; that he saw the deceased before the deed was actually signed, and that at that time Mr. Hendricks said he wanted to make D. J. Hendricks, Jr., a deed, that he was going to make him (Jay) a deed to some property. Later, Robertson went again to the home of the deceased and witnessed the execution of the deed. "I was present when Mr. D. J. Hendricks, Sr. made his mark. He made the mark with Monroe holding his hand at the proper place. He told Monroe he couldn't see where to make the mark, and he asked him to help him. To my knowledge, Mr. D. J. Hendricks, Jr. did not have anything to do with helping Mr. D. J. Hendricks, Sr. make the mark. He didn't help him in any way that I noticed." The witness further testified, in effect, that the deceased understood what he was doing, the nature and consequences of his act in making the deed; that he knew what land he was disposing of, to whom he was disposing of it, and how he was disposing of it. "My opinion is that his mental condition was very good. I think he had the capacity to do it."
William O. Hendricks, brother of Jay, testified, among other things, "I knew the arrangement between my father and [Jay]. * * * [M]y father told me about the arrangement. * * * I was not surprised that the deed had been made because I knew it was under contract to be made. * * * *502 He [his father] had sufficient understanding to know what he was doing, the nature and consequences of his act in making the deed, what land he was disposing of, to whom and how. * * * [M]y opinion is that he had the understanding to know those things."
It will be noted that William and Monroe were testifying against their own interest in that if the deed was set aside each would get one-eighth undivided interest in the sixty-four acres conveyed to Jay.
Unless the rule in McNeill v. McNeill, 223 N.C. 178, 25 S.E.2d 615, is applicable, the evidence in this case will not support an issue of undue influence. In that opinion it is said that where one occupies a confidential relationship with another and benefits from a transaction that "such circumstances create a strong suspicion that an undue or fraudulent influence has been exerted, and then the law casts upon him the burden of removing the suspicion by offering proof that the will was the free and voluntary act of the testator." The term "confidential relationship" implies a preferential position. All of the children in a family ordinarily occupy a confidential relationship with their father, but as said in Walters v. Bridgers, 251 N.C. 289, 111 S.E. 2d 176, the relation of parent and child does not raise the presumption of fraud, nor does it constitute a fiduciary or confidential relationship requiring the beneficiary to establish lack of duress or undue influence in their dealings. To bring the McNeill ruling into play, relationship would have to be shown as more intimate and influential than the other children enjoy. Here, it is shown that Monroe lived in the house with his father while Jay lived a mile or so away. Charles testified that he visited his father at least once a week, usually spent a month with him during the summer, and that he and his father frequently discussed the affairs of the farm and of the father's business. Austin, another son, testified that he was in his father's home three and four times a week and visited at all times of the day and night. From the record we can find nothing to sustain the claim that Jay occupied a superior position with his father or had more control over his actions than did his brothers, and we are of the opinion that the submission of this issue constitutes prejudicial error. Cathey v. Shope, 238 N.C. 345, 78 S.E.2d 135; Vann Co. v. Barefoot, 249 N.C. 22, 105 S.E.2d 104.
In Plemmons v. Murphey, 176 N.C. 671, 97 S.E. 648, it is said:
"A father may have favorites among his children because some, more than others, have favored him in his old age, when by reason of his infirmities he needed their watchful care and attention. They may properly, but not unduly, use moral persuasion to obtain, what they think they deserve, a larger share of his bounty than the others, who are not justly entitled to so much.
"We said in the Craven Will Case (169 N.C. at p. 570, 86 S.E. 593) [In re Craven's Will, 169 N.C. 561, 86 S.E. 587]: `It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection or of the power of rewarding those who bestow it. These views were strongly approved and commended by the Court in Mackall v. Mackall, 135 U.S. 167, 10 S.Ct. 705, 34 L.Ed. at page 84, where the conclusion was reached that, in a legal sense, undue influence must destroy free agency. "It is well settled," said Justice Brewer, "that in order to avoid a will on the ground of undue influence, it must appear that the testator's free agency was destroyed and that his will was overborne by excessive importunity, imposition, or fraud, so that the will does not, in fact, express his wishes as to the disposition of his property, but those of the persons exercising the influence." The court then also used language closely applicable to the facts in our case: "That the relations *503 between this father and his several children, during the score of years preceding his death, naturally inclined him towards the one and against the others is evident, and to have been expected. It would have been strange if such a result had not followed; but such partiality towards the one, and influence resulting therefrom, are not only natural, but just and reasonable, and come far short of presenting the undue influence which the law denounces. Right or wrong, it is to be expected that a parent will favor the child who stands by him, and to give to him, rather than the others, his property. To defeat a conveyance under those circumstances, something more than the natural influence springing from such relationship must be shown; imposition, fraud, importunity, duress, or something of that nature, must appear; otherwise, that disposition of property which accords with the natural inclinations of the human heart must be sustained."'"
The case of Willetts v. Willetts, 254 N.C. 136, 118 S.E.2d 548, is quite similar to this one. In it the father made a deed to his son for a valuable tract of land, and after his death his brothers and sisters attempted to set it aside upon the grounds of undue influence. The evidence showed that the son assisted his father in farming and in marketing his crops and livestock; that his father often requested the son's advice in connection with his business affairs, and that he listed his father's land for taxes as agent of his father. The lower court allowed motion for nonsuit which was affirmed, the court saying that the doctrine in McNeill v. McNeill, supra, did not apply.
The defendants take exception to the following part of the Court's charge:
"It is very generally held that when a will or a deed is executed through the intervention of a person occupying a confidential relation to the maker of the instrument, whereby such a person becomes a large beneficiary, the circumstances create strong suspicion that undue influence has been exerted.
"Where the grantee or other beneficiary of a deed or will is a person who has maintained intimate relations with the grantor, or the testator, or has drafted or advised the terms of the instrument, a presumption of undue influence, or of fraud, on the part of the beneficiary has often been applied." (Emphasis added)
These instructions are improper for two reasons. First, they do not require that the jury find that a confidential or intimate relationship existed between Jay and his father but assume that it did. Second, there being no evidence tending to show a confidential relationship, it comes within the inhibition of Carswell v. Lackey, 253 N.C. 387, 117 S.E.2d 51, in which we have stated that a correct legal instruction constitutes error where not applicable to the facts and the evidence of a case, which is the situation we have here.
The defendants take exception to several statements made by the trial judge in attempting to get witnesses to answer the questions propounded. An examination of the record shows that in each instance the admonition was correct and justified. We cannot limit the authority of the judge to require the witnesses to respond to the questions rather than arguing the matter, and these exceptions are without merit.
Nevertheless, we are of the opinion that the incompetent evidence admitted upon the first issue and the submission of the issue of undue influence, and the instructions thereon, constitute reversible error, and that the defendants are entitled to a
New trial.
SHARP, Justice (dissenting):
By its answer to the two issues submitted, the jury determined (1) that Daniel J. Hendricks, Sr., on 15 April 1965, lacked mental capacity to execute the deed to defendant *504 Daniel J. Hendricks, Jr., which plaintiffs seek to set aside, and (2) that the deed was procured by the undue influence of Daniel J. Hendricks, Jr. The answer to either issue is sufficient to support the judgment setting the deed aside. Therefore, even if it be conceded arguendo that the submission of the issue of undue influence was not warranted by the evidence; that incompetent hearsay declarations of the grantor tending to establish undue influence were admitted; and that there was error in the charge with reference to the second issue, these errors did not affect the first issue. The challenged declarations of the grantor were to the effect that he had not promised defendant-grantee anything; that if he owed him anything extra he had given him a building lot. Defendants state in their brief that his statement, "rather than revealing a man who lacks mental capacity, shows a man who is very much in control of the situation. It tends to prove, rather than to disprove, adequate mental capacity." The admission of this evidence, therefore, did not prejudice defendant on the first issue. Neither, in my opinion, did the submission of the second issue and the charge with reference to it.
The majority, however, would vacate the jury's verdict upon the first issue because the judge permitted witnesses for plaintiff to answer the following question:
"* * * [D]o you have an opinion satisfactory to yourself as to whether or not Daniel J. Hendricks on these occasions when you did see him between 29 January 1965 and 15 April 1965 had sufficient mental capacity to understand the nature and consequences of making a deed, its scope and effect, and know what land he was disposing of, and to whom, and how?"
All question of grammar aside, this question is phrased in substantial compliance with the rule laid down in McDevitt v. Chandler, 241 N.C. 677, 86 S.E.2d 438 the case upon which the majority relies to award a new trial. In McDevitt, the question which the court condemned was asked by the trial judge himself and was: "Is it your opinion on that day she didn't have sufficient mental capacity to make a deed?" In awarding a new trial this court said that a witness may not make the abstract statement that a grantor "did not have sufficient mental capacity to make a deed," because such capacity is a conclusion which the law draws from certain facts as a premise. These facts are: "whether the grantor understood what he was doing the nature and consequences of his act in making the deed; that is, whether he knew what land he was disposing of, to whom, and how." Id. at 680, 86 S.E.2d at 440. (Emphasis added.) Analysis reveals no difference between the foregoing rule from McDevitt and the question propounded to plaintiff's witness in this case. The question here also complies with the test for contractual capacity quoted in the majority opinion from Goins v. McLoud, 231 N.C. 655, 58 S.E.2d 634.
It is noted that in Goins v. McLoud, supra, a suit also involving the validity of the deed, the jury found (1) that the grantor lacked mental capacity to execute the deed and (2) that its execution had been procured by fraud and undue influence. On appeal, this court found error affecting the first issue but not the second. A trial de novo was ordered because the court thought the question of undue influence and fraud was, in both the complaint and evidence in that case, so tied up with the mental condition of the grantor that it was the strongest factor leading to the answer to the second issue. Such is not the situation here. I vote to sustain the judgment entered in the court below.
BOBBITT, J., joins in the dissenting opinion.